PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 24, 2000
THOMAS K. KAHN
CLERK

_____

Nos. 99-13814 & 99-15152

_____

D.C. Docket Nos. 99-00015-CR-R-001 & 99-00015-CR-4-002

UNITED STATES OF AMERCIA,

Plaintiff-Appellee,

versus

CHRISTOPHER DRAYTON & CLIFTON BROWN, JR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(October 24, 2000)**

Before CARNES and BARKETT, Circuit Judges, and POLLAK[*], District Judge.
CARNES, Circuit Judge:

_____

[*] Honorable Louis H. Pollak, U.S. District Court Judge for the Eastern District of
Pennsylvania, sitting by designation.

This is another in a series of cases involving warrantless searches of bus passengers.  See generally United States v. Washington, 151 F.3d 1354 (11th Cir. 1998); United States v. Guapi, 144 F.3d 1393 (11th Cir. 1998).  As a result of the searches involved in this case Christopher Drayton and Clifton Brown, Jr. were each convicted of conspiring to distribute cocaine and possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841and 846.  They appeal, contending that the district court erred in denying their motions to suppress the cocaine found in the search of their persons.[1]

The only issue before this Court is, as we put it in Washington, 151 F.3d at 1355, whether the consent given by each defendant for the search was "uncoerced and legally voluntary" under the Fourth Amendment.  Because the facts of this case are not distinguishable in a meaningful way from those in Washington, we are compelled by that decision to hold that these defendants' consent was not sufficiently free of coercion to serve as a valid basis for a search. [2]

---

[1] Drayton and Brown were  convicted and appealed separately, but we have consolidated their appeals because the facts, which were developed at a joint hearing on their motions to suppress, are identical.

[2] The Washington decision has been criticized by the Tenth Circuit, which has declined to follow it.  See United States v. Broomfield, 201 F.3d 1270, 1275 (10th Cir. 2000) (characterizing Washington as, in effect, having "creat[ed] a per se rule that authorities must notify bus passengers of the right to refuse consent before questioning those passengers and asking for consent to search luggage," which "renders the soundness of the Washington opinion questionable"); accord Washington, 151 F.3d at 1358 (Black, J., dissenting). We do not have any

## I. FACTUAL BACKGROUND

On February 4, 1999, a bus containing about 25 to 30 passengers en route from Ft. Lauderdale to Detroit made a scheduled stop at a Greyhound bus station in downtown Tallahassee, Florida. During the stop, all of the passengers were required to exit the bus temporarily for reasons unrelated to law enforcement. As the passengers re-boarded, the driver checked their tickets before leaving to handle paperwork in the bus terminal office. Before the driver left for the terminal office, three members of the Tallahassee Police Department received permission from him for them to board the bus while the passengers were seated and waiting to depart. The officers were dressed casually and their badges were either hanging around their necks or held in their hands. They wore their guns in side-holsters, which were covered by either a shirt or jacket. There is no evidence to indicate that any passenger ever saw that the officers were armed.

Once on board the bus the officers did not make any general announcements to the passengers nor did they hold up their badges for all of the passengers to see. Officers Lang and Blackburn made their way to the back of the bus, while Officer Hoover knelt in the bus driver's seat, facing toward the rear of the bus in order to

occasion to pass on that criticism, and express no view concerning it, because we are bound by the prior panel decision in Washington in any event. Wascura v. Carver, 169 F.3d 683, 687 (11th Cir. 1999).

3

observe the passengers and ensure the safety of the other officers. In that position, Hoover could see the passengers and they could see him.

Officers Lang and Blackburn went to the back of the bus and started working their way forward, asking passengers where they were traveling from, and attempting to match passengers to the luggage in the overhead rack. The officers did not block the aisle, but instead stood next to or behind the passengers with whom they were talking. According to Lang's testimony, passengers who declined to have their luggage searched or who wished to exit the bus at any time would have been permitted to do so without argument.[3] In similar bus searches conducted by Lang over the past year, five to seven passengers declined to have their luggage searched, and an unspecified number of other passengers exited the bus during the searches.

Defendants Drayton and Brown were seated next to each other a few rows from the rear of the bus on the driver's side, with Drayton in the aisle seat and Brown next to the window. After examining the rear of the bus, Lang approached the defendants from behind and leaned over Drayton's shoulder. He held up his badge long enough for the defendants to see that he was a police officer and, with

---

[3] Officer Lang was the only witness to testify at the joint hearing on the defendants' motions to suppress.

his face 12-18 inches away from Drayton's face, Lang spoke in a voice just loud enough for the defendants to hear. He told them:

> I'm Investigator Lang with the Tallahassee Police Department. We're conducting bus interdiction, attempting to deter drugs and illegal weapons being transported on the bus. Do you have any bags on the bus?

Both of the defendants responded by pointing to a green bag in the overhead luggage rack. Lang asked, "Do you mind if I check it?," to which Brown responded, "Go ahead." Lang handed the bag to Officer Blackburn to check. He did check it, and no contraband was found in the bag.

Officer Lang had noticed that both defendants were wearing heavy jackets and baggy pants despite the fact that it was a warm day, and he thought that they were overly cooperative during the search. So Lang requested and received permission from Brown to conduct a pat-down search of his person for weapons. Brown leaned up in his seat, pulled a cell phone out of his pocket, and opened up his jacket. Lang then reached across Drayton and patted down Brown's jacket and pockets, including his waist area, sides, and upper thighs. In both thigh areas, Lang detected hard objects which were inconsistent with human anatomy but similar to drug packages he had found on other occasions. Lang arrested and handcuffed Brown, and Officer Hoover escorted Brown off the bus.

Lang next turned to Drayton and asked, "Mind if I check you?" Drayton responded by lifting his hands approximately eight inches off of his legs. Lang conducted a similar pat-down of Drayton's thighs. When Lang detected hard objects on Drayton's thighs similar to those he had felt on Brown, Drayton was arrested and escorted off the bus.

Once the defendants were off the bus, Lang unbuttoned their trousers and found plastic bundles of powder cocaine duct-taped between several pairs of boxer shorts. Drayton had two bundles containing 295 grams of cocaine, and Brown had three bundles containing 483 grams of cocaine.

## II. DISCUSSION

This case is controlled by our decision in United States v. Washington, 151 F.3d 1354 (11th Cir. 1998), which extended United States v. Guapi, 144 F.3d 1393 (11th Cir. 1998).[4] In Washington, federal agents searched passengers on a bus after it had made a scheduled stop. See 151 F.3d at 1355. The search revealed cocaine concealed in the pants of one of the passengers. See id. at 1356. Concluding that the facts and circumstances surrounding the search indicated that

[4] Our holding is consistent with United States v. Hill, No. 99-12662 (11th Cir., July 24, 2000) (unpublished opinion), a case that is factually indistinguishable from this one, which concluded that Washington compels a suppression of the evidence given these facts. Although Hill is an unpublished opinion and therefore not binding precedent, we do find its analysis of Washington's application persuasive. See 11th Cir. R. 36-2.

"a reasonable person ... would not have felt free to disregard [the agents'] requests without some positive indication that consent could have been refused," this Court held that the search violated the Fourth Amendment's prohibition against unreasonable searches and seizures. See id. at 1357.

We do not believe that any of the factual differences between this case and Washington are material. One factual difference is that the officers in this case spoke to the  passengers only individually, unlike in Washington where an officer stood up in front of the bus, with his badge held over his head, and announced to all of the passengers that the agents were about to conduct a routine bus check. See id. at 1355; Guapi, 144 F.3d at 1394 (reciting police officer's announcement to the whole bus). The government argues that the lack of a "show of authority" in the form of an announcement to all the passengers distinguishes this case from Washington.

We disagree. Although there was no general show of authority at the front of the bus in this case, there was a specific show of authority passenger-by-passenger. Officer Lang approached the defendants with his badge held up in his hand, leaned over with his face 12-18 inches from Drayton's, and told the defendants that he was conducting a bus interdiction, looking for drugs and illegal weapons. We do not believe that a passenger-specific show of authority is any less

7

coercive than a general bus-wide one.[5]  Moreover, the general announcement made

by the agent in <u>Washington</u> included the statement that, "No one is under arrest or

anything like that, we're just conducting a routine bus check."  151 F.3d at 1355.

There was no such reassurance in this case.

Another difference between  <u>Washington</u> and this case is that Officer Lang

did not have the defendants display their tickets or photo identification before he

conducted the search.  <u>See id</u>. at 1355-56.  Apparently, the reason the officers in

<u>Washington</u> asked to see tickets and identification was to look for suspicious

circumstances, but we do not see how the failure to ask for such documents affects

whether other requests or commands are coercive.  <u>See</u> <u>Guapi</u> 144 F.3d at 1393-94,

1397 (finding bus search coercive even though officers did not request defendant's

ticket or identification).

A third difference involves the record relating to instances in which Officer

Lang had searched other buses.  Lang testified that during the past year five to

seven people had declined to have their luggage searched, and that passengers had

often exited the bus while the officers were on it.  If there was any similar

---

[5]  In <u>Guapi</u>, this Court stated that when officers individually approach passengers and communicate an intention to conduct a search, instead of making a general announcement, there is "no reason to believe ... that they are coercing or intimidating citizens."  144 F.3d at 1396. Those were not the facts in <u>Guapi</u>, however, so the statement is only dicta, and we are not persuaded by it.

information in the record in <u>Washington</u>, the opinion does not indicate it.

Nonetheless, the existence of that information in this case fails to distinguish it

from <u>Washington</u>. Officer Lang did not testify that the statements the officers

made and the methods they used in the searches where passengers declined to give

consent or exited the bus were the same as in this case. <u>See</u> <u>also</u> <u>Guapi</u>, 144 F.3d at

1396 (although the officer could recall several times where passengers had

previously refused his search requests, "It is undisputed that in the instant

circumstances no passengers refused the search"). Not only that, but according to

Lang's testimony, he had searched approximately eight hundred buses in the past

year. Even if Lang spoke with only three or four passengers per bus, six or seven

refusals out of hundreds of requests is not very many.[6]

One final factual difference between this case and <u>Washington</u> actually cuts

in the defendants' favor. Here, after the three officers boarded the bus, one of them

remained at the front, kneeling in the bus driver's seat in view of the passengers.

Seeing an officer stationed at the bus exit during a police interdiction might make a

---

[6] The government also argues that this case is distinguishable from <u>Washington</u> due to the background and experience of the defendants. The government points out that Drayton was 26 years old, was employed for six of the previous eight years, and had experience with law enforcement in connection with previous drug charges, and that Brown was 29 years old and had previously been employed for three years as a correctional officer. However, we reject that purported distinction, because the test is an objective one. <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 438, 111 S. Ct. 2382, 2388 (1991) ("whether a reasonable person would have felt free to decline the officers' requests"); <u>Washington</u>, 151 F.3d at 1357.

9

reasonable person feel less free to leave the bus. See United States v. Hill, No. 99-12662 (11th Cir., July 24, 2000) (unpublished opinion) ("The presence of an officer at the exit, even if not so intended, is an implication to passengers that the searches are mandatory."); Washington, 151 F.3d at 1358 (Black, J., dissenting) (emphasizing absence of officer at front of bus in that case); see also Guapi, 144 F.3d at 1396 (noting that the exit was blocked by police officers).

## III.  CONCLUSION

For the reasons we have explained, we conclude that the outcome of this case is controlled by our decision in Washington, which requires that we reverse the convictions of these two defendants and remand with instructions that the district court grant their motions to suppress.

REVERSED AND REMANDED.