# UNITED STATES *v.* DRAYTON ET AL.

No. 01–631.   Argued April 16, 2002—Decided June 17, 2002

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, THOMAS, and BREYER, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post*, p. 208.

*Larry D. Thompson* argued the cause for the United States. On the briefs were *Solicitor General Olson, Assistant Attorney General Chertoff, Deputy Solicitor General Dreeben, Jeffrey A. Lamken,* and *Kathleen A. Felton.*

*Gwendolyn Spivey,* by appointment of the Court, 535 U. S. 903, argued the cause for respondents. With her on the brief were *Randolph P. Murrell, Steven L. Seliger,* by ap-

pointment of the Court, 535 U. S. 903, *Jeffrey T. Green,* and *Jacqueline G. Cooper.*\*

JUSTICE KENNEDY delivered the opinion of the Court.

The Fourth Amendment permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse. *Florida* v. *Bostick,* 501 U. S. 429 (1991). This case requires us to determine whether officers must advise bus passengers during these encounters of their right not to cooperate.

## I

On February 4, 1999, respondents Christopher Drayton and Clifton Brown, Jr., were traveling on a Greyhound bus en route from Ft. Lauderdale, Florida, to Detroit, Michigan. The bus made a scheduled stop in Tallahassee, Florida. The passengers were required to disembark so the bus could be refueled and cleaned. As the passengers reboarded, the driver checked their tickets and then left to complete paperwork inside the terminal. As he left, the driver allowed three members of the Tallahassee Police Department to board the bus as part of a routine drug and weapons interdiction effort. The officers were dressed in plain clothes and carried concealed weapons and visible badges.

Once onboard Officer Hoover knelt on the driver's seat and faced the rear of the bus. He could observe the passengers

---

\*Daniel J. Popeo and Richard A. Samp filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

Leon Friedman and Joshua L. Dratel filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

James P. Manak, Wayne W. Schmidt, Richard Weintraub, Bernard J. Farber, and Carl Milazzo filed a brief for Americans For Effective Law Enforcement, Inc., et al. as *amici curiae.*

and ensure the safety of the two other officers without blocking the aisle or otherwise obstructing the bus exit. Officers Lang and Blackburn went to the rear of the bus. Blackburn remained stationed there, facing forward. Lang worked his way toward the front of the bus, speaking with individual passengers as he went. He asked the passengers about their travel plans and sought to match passengers with luggage in the overhead racks. To avoid blocking the aisle, Lang stood next to or just behind each passenger with whom he spoke.

According to Lang's testimony, passengers who declined to cooperate with him or who chose to exit the bus at any time would have been allowed to do so without argument. In Lang's experience, however, most people are willing to cooperate. Some passengers go so far as to commend the police for their efforts to ensure the safety of their travel. Lang could recall five to six instances in the previous year in which passengers had declined to have their luggage searched. It also was common for passengers to leave the bus for a cigarette or a snack while the officers were on board. Lang sometimes informed passengers of their right to refuse to cooperate. On the day in question, however, he did not.

Respondents were seated next to each other on the bus. Drayton was in the aisle seat, Brown in the seat next to the window. Lang approached respondents from the rear and leaned over Drayton's shoulder. He held up his badge long enough for respondents to identify him as a police officer. With his face 12-to-18 inches away from Drayton's, Lang spoke in a voice just loud enough for respondents to hear:

> "I'm Investigator Lang with the Tallahassee Police Department. We're conducting bus interdiction [sic], attempting to deter drugs and illegal weapons being transported on the bus. Do you have any bags on the bus?" App. 55.

Both respondents pointed to a single green bag in the overhead luggage rack. Lang asked, "Do you mind if I check it?," and Brown responded, "Go ahead." *Id.*, at 56. Lang handed the bag to Officer Blackburn to check. The bag contained no contraband.

Officer Lang noticed that both respondents were wearing heavy jackets and baggy pants despite the warm weather. In Lang's experience drug traffickers often use baggy clothing to conceal weapons or narcotics. The officer thus asked Brown if he had any weapons or drugs in his possession. And he asked Brown: "Do you mind if I check your person?" Brown answered, "Sure," and cooperated by leaning up in his seat, pulling a cell phone out of his pocket, and opening up his jacket. *Id.*, at 61. Lang reached across Drayton and patted down Brown's jacket and pockets, including his waist area, sides, and upper thighs. In both thigh areas, Lang detected hard objects similar to drug packages detected on other occasions. Lang arrested and handcuffed Brown. Officer Hoover escorted Brown from the bus.

Lang then asked Drayton, "Mind if I check you?" *Id.*, at 65. Drayton responded by lifting his hands about eight inches from his legs. Lang conducted a patdown of Drayton's thighs and detected hard objects similar to those found on Brown. He arrested Drayton and escorted him from the bus. A further search revealed that respondents had duct-taped plastic bundles of powder cocaine between several pairs of their boxer shorts. Brown possessed three bundles containing 483 grams of cocaine. Drayton possessed two bundles containing 295 grams of cocaine.

Respondents were charged with conspiring to distribute cocaine, in violation of 21 U. S. C. §§ 841(a)(1) and 846, and with possessing cocaine with intent to distribute it, in violation of § 841(a)(1). They moved to suppress the cocaine, arguing that the consent to the patdown search was invalid. Following a hearing at which only Officer Lang testified, the

United States District Court for the Northern District of Florida denied their motions to suppress. The District Court determined that the police conduct was not coercive and respondents' consent to the search was voluntary. The District Court pointed to the fact that the officers were dressed in plain clothes, did not brandish their badges in an authoritative manner, did not make a general announcement to the entire bus, and did not address anyone in a menacing tone of voice. It noted that the officers did not block the aisle or the exit, and stated that it was "obvious that [respondents] can get up and leave, as can the people ahead of them." App. 132. The District Court concluded: "[E]verything that took place between Officer Lang and Mr. Drayton and Mr. Brown suggests that it was cooperative. There was nothing coercive, there was nothing confrontational about it." *Ibid.*

The Court of Appeals for the Eleventh Circuit reversed and remanded with instructions to grant respondents' motions to suppress. 231 F. 3d 787 (2000). The court held that this disposition was compelled by its previous decisions in *United States* v. *Washington,* 151 F. 3d 1354 (1998), and *United States* v. *Guapi,* 144 F. 3d 1393 (1998). Those cases had held that bus passengers do not feel free to disregard police officers' requests to search absent "some positive indication that consent could have been refused." *Washington, supra,* at 1357.

We granted certiorari. 534 U. S. 1074 (2002). The respondents, we conclude, were not seized and their consent to the search was voluntary; and we reverse.

## II

Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. See, *e. g., Florida* v. *Royer,* 460 U. S. 491, 497 (1983)

(plurality opinion); see *id.*, at 523, n. 3 (REHNQUIST, J., dissenting); *Florida* v. *Rodriguez,* 469 U. S. 1, 5–6 (1984) *(per curiam)* (holding that such interactions in airports are "the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest"). Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means. See *Florida* v. *Bostick,* 501 U. S., at 434–435 (citations omitted). If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.

The Court has addressed on a previous occasion the specific question of drug interdiction efforts on buses. In *Bostick,* two police officers requested a bus passenger's consent to a search of his luggage. The passenger agreed, and the resulting search revealed cocaine in his suitcase. The Florida Supreme Court suppressed the cocaine. In doing so it adopted a *per se* rule that due to the cramped confines onboard a bus the act of questioning would deprive a person of his or her freedom of movement and so constitute a seizure under the Fourth Amendment.

This Court reversed. *Bostick* first made it clear that for the most part *per se* rules are inappropriate in the Fourth Amendment context. The proper inquiry necessitates a consideration of "all the circumstances surrounding the encounter." *Id.,* at 439. The Court noted next that the traditional rule, which states that a seizure does not occur so long as a reasonable person would feel free "to disregard the police and go about his business," *California* v. *Hodari D.,* 499 U. S. 621, 628 (1991), is not an accurate measure of the coercive effect of a bus encounter. A passenger may not want to get off a bus if there is a risk it will depart before the opportunity to reboard. *Bostick,* 501 U. S., at 434–436. A bus rider's movements are confined in this sense, but this is the natural result of choosing to take the bus; it says noth-

ing about whether the police conduct is coercive. *Id.*, at 436. The proper inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Ibid.* Finally, the Court rejected Bostick's argument that he must have been seized because no reasonable person would consent to a search of luggage containing drugs. The reasonable person test, the Court explained, is objective and "presupposes an *innocent* person." *Id.*, at 437–438.

In light of the limited record, *Bostick* refrained from deciding whether a seizure occurred. *Id.*, at 437. The Court, however, identified two factors "particularly worth noting" on remand. *Id.*, at 432. First, although it was obvious that an officer was armed, he did not remove the gun from its pouch or use it in a threatening way. Second, the officer advised the passenger that he could refuse consent to the search. *Ibid.*

Relying upon this latter factor, the Eleventh Circuit has adopted what is in effect a *per se* rule that evidence obtained during suspicionless drug interdiction efforts aboard buses must be suppressed unless the officers have advised passengers of their right not to cooperate and to refuse consent to a search. In *United States* v. *Guapi, supra,* the Court of Appeals described "[t]he most glaring difference" between the encounters in *Guapi* and in *Bostick* as "the complete lack of any notification to the passengers that they were in fact free to decline the search request. . . . Providing [this] simple notification . . . is perhaps the most efficient and effective method to ensure compliance with the Constitution." 144 F. 3d, at 1395. The Court of Appeals then listed other factors that contributed to the coerciveness of the encounter: (1) the officer conducted the interdiction before the passengers disembarked from the bus at a scheduled stop; (2) the officer explained his presence in the form of a general announcement to the entire bus; (3) the officer wore a police uniform; and (4) the officer questioned passengers as he

moved from the front to the rear of the bus, thus obstructing the path to the exit. *Id.*, at 1396.

After its decision in *Guapi* the Court of Appeals decided *United States* v. *Washington* and the instant case. The court suppressed evidence obtained during similar drug interdiction efforts despite the following facts: (1) the officers in both cases conducted the interdiction after the passengers had reboarded the bus; (2) the officer in the present case did not make a general announcement to the entire bus but instead spoke with individual passengers; (3) the officers in both cases were not in uniform; and (4) the officers in both cases questioned passengers as they moved from the rear to the front of the bus and were careful not to obstruct passengers' means of egress from the bus.

Although the Court of Appeals has disavowed a *per se* requirement, the lack of an explicit warning to passengers is the only element common to all its cases. See *Washington*, 151 F. 3d, at 1357 ("It seems obvious to us that if police officers genuinely want to ensure that their encounters with bus passengers remain absolutely voluntary, they can simply say so. Without such notice in this case, we do not feel a reasonable person would have felt able to decline the agents' requests"); 231 F. 3d, at 790 (noting that "[t]his case is controlled by" *Guapi* and *Washington*, and dismissing any factual differences between the three cases as irrelevant). Under these cases, it appears that the Court of Appeals would suppress any evidence obtained during suspicionless drug interdiction efforts aboard buses in the absence of a warning that passengers may refuse to cooperate. The Court of Appeals erred in adopting this approach.

Applying the *Bostick* framework to the facts of this particular case, we conclude that the police did not seize respondents when they boarded the bus and began questioning passengers. The officers gave the passengers no reason to believe that they were required to answer the officers' questions. When Officer Lang approached respondents, he

did not brandish a weapon or make any intimidating movements. He left the aisle free so that respondents could exit. He spoke to passengers one by one and in a polite, quiet voice. Nothing he said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter.

There were ample grounds for the District Court to conclude that "everything that took place between Officer Lang and [respondents] suggests that it was cooperative" and that there "was nothing coercive [or] confrontational" about the encounter. App. 132. There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional. The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure. See *Bostick*, 501 U. S., at 439–440. Indeed, because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances.

Respondents make much of the fact that Officer Lang displayed his badge. In *Florida* v. *Rodriguez*, 469 U. S., at 5–6, however, the Court rejected the claim that the defendant was seized when an officer approached him in an airport, showed him his badge, and asked him to answer some questions. Likewise, in *INS* v. *Delgado*, 466 U. S. 210, 212–213 (1984), the Court held that Immigration and Naturalization Service (INS) agents' wearing badges and questioning workers in a factory did not constitute a seizure. And while neither Lang nor his colleagues were in uniform or visibly armed, those factors should have little weight in the analysis. Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort.

Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.

Officer Hoover's position at the front of the bus also does not tip the scale in respondents' favor. Hoover did nothing to intimidate passengers, and he said nothing to suggest that people could not exit and indeed he left the aisle clear. In *Delgado*, the Court determined there was no seizure even though several uniformed INS officers were stationed near the exits of the factory. *Id.*, at 219. The Court noted: "The presence of agents by the exits posed no reasonable threat of detention to these workers, . . . the mere possibility that they would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way." *Ibid.*

Finally, the fact that in Officer Lang's experience only a few passengers have refused to cooperate does not suggest that a reasonable person would not feel free to terminate the bus encounter. In Lang's experience it was common for passengers to leave the bus for a cigarette or a snack while the officers were questioning passengers. App. 70, 81. And of more importance, bus passengers answer officers' questions and otherwise cooperate not because of coercion but because the passengers know that their participation enhances their own safety and the safety of those around them. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Delgado, supra,* at 216.

Drayton contends that even if Brown's cooperation with the officers was consensual, Drayton was seized because no reasonable person would feel free to terminate the encounter with the officers after Brown had been arrested. The Court

of Appeals did not address this claim; and in any event the argument fails. The arrest of one person does not mean that everyone around him has been seized by police. If anything, Brown's arrest should have put Drayton on notice of the consequences of continuing the encounter by answering the officers' questions. Even after arresting Brown, Lang addressed Drayton in a polite manner and provided him with no indication that he was required to answer Lang's questions.

We turn now from the question whether respondents were seized to whether they were subjected to an unreasonable search, i. e., whether their consent to the suspicionless search was involuntary. In circumstances such as these, where the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts. And, as the facts above suggest, respondents' consent to the search of their luggage and their persons was voluntary. Nothing Officer Lang said indicated a command to consent to the search. Rather, when respondents informed Lang that they had a bag on the bus, he asked for their permission to check it. And when Lang requested to search Brown and Drayton's persons, he asked first if they objected, thus indicating to a reasonable person that he or she was free to refuse. Even after arresting Brown, Lang provided Drayton with no indication that he was required to consent to a search. To the contrary, Lang asked for Drayton's permission to search him ("Mind if I check you?"), and Drayton agreed.

The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. See, e. g., Ohio v. Robinette, 519 U. S. 33, 39–40 (1996); Schneckloth v. Bustamonte, 412 U. S. 218, 227 (1973). "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective

consent." *Ibid.* Nor do this Court's decisions suggest that even though there are no *per se* rules, a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning. See, *e. g., Schneckloth, supra; Robinette, supra,* at 39–40. Although Officer Lang did not inform respondents of their right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that their consent was voluntary, so the searches were reasonable.

In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

We need not ask the alternative question whether, after the arrest of Brown, there were grounds for a *Terry* stop and frisk of Drayton, *Terry* v. *Ohio,* 392 U. S. 1 (1968), though this may have been the case. It was evident that Drayton and Brown were traveling together—Officer Lang observed the pair reboarding the bus together; they were each dressed in heavy, baggy clothes that were ill-suited for the day's warm temperatures; they were seated together on the bus; and they each claimed responsibility for the single piece of green carry-on luggage. Once Lang had identified Brown as carrying what he believed to be narcotics, he may have had reasonable suspicion to conduct a *Terry* stop and frisk on Drayton as well. That question, however, has not been presented to us. The fact the officers may have had reasonable suspicion does not prevent them from relying on a citizen's consent to the search. It would be a paradox, and one most puzzling to law enforcement officials and courts alike, were

we to say, after holding that Brown's consent was voluntary, that Drayton's consent was ineffectual simply because the police at that point had more compelling grounds to detain him. After taking Brown into custody, the officers were entitled to continue to proceed on the basis of consent and to ask for Drayton's cooperation.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

Anyone who travels by air today submits to searches of the person and luggage as a condition of boarding the aircraft. It is universally accepted that such intrusions are necessary to hedge against risks that, nowadays, even small children understand. The commonplace precautions of air travel have not, thus far, been justified for ground transportation, however, and no such conditions have been placed on passengers getting on trains or buses. There is therefore an air of unreality about the Court's explanation that bus passengers consent to searches of their luggage to "enhanc[e] their own safety and the safety of those around them." *Ante,* at 205. Nor are the other factual assessments underlying the Court's conclusion in favor of the Government more convincing.

The issue we took to review is whether the police's examination of the bus passengers, including respondents, amounted to a suspicionless seizure under the Fourth Amendment.[1] If it did, any consent to search was plainly

---

[1] The Court proceeds to resolve the voluntariness issue on the heels of its seizure enquiry, but the voluntariness of respondents' consent was not within the question the Court accepted for review. Accord, Reply Brief for United States 20, n. 7 (stating that the consent issue "is not presented by this case; the question here is whether there was an illegal seizure

invalid as a product of the illegal seizure. See *Florida* v. *Royer*, 460 U. S. 491, 507–508 (1983) (plurality opinion) ("[T]he consent was tainted by the illegality and . . . ineffective to justify the search"); *id.*, at 509 (Powell, J., concurring); *id.*, at 509 (Brennan, J., concurring in result).

*Florida* v. *Bostick*, 501 U. S. 429 (1991), established the framework for determining whether the bus passengers were seized in the constitutional sense. In that case, we rejected the position that police questioning of bus passengers was a *per se* seizure, and held instead that the issue of seizure was to be resolved under an objective test considering all circumstances: whether a reasonable passenger would have felt "free to decline the officers' requests or otherwise terminate the encounter," *id.*, at 436. We thus applied to a bus passenger the more general criterion, whether the person questioned was free "to ignore the police presence and go about his business," *id.*, at 437 (quoting *Michigan* v. *Chesternut*, 486 U. S. 567, 569 (1988)).

Before applying the standard in this case, it may be worth getting some perspective from different sets of facts. A perfect example of police conduct that supports no colorable claim of seizure is the act of an officer who simply goes up to a pedestrian on the street and asks him a question. See *Royer*, 460 U. S., at 497; see *id.*, at 523, n. 3 (REHNQUIST, J., dissenting). A pair of officers questioning a pedestrian,

---

in the first place"). While it is true that the Eleventh Circuit purported to address the question "whether the consent given by each defendant for the search was 'uncoerced and legally voluntary,'" 231 F. 3d 787, 788 (2000), elsewhere the court made it clear that it was applying the test in *Florida* v. *Bostick*, 501 U. S. 429 (1991), which is relevant to the issue of seizure, 231 F. 3d, at 791, n. 6. There is thus no occasion here to reach any issue of consent untainted by seizure. If there were, the consent would have to satisfy the voluntariness test of *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1973), which focuses on "the nature of a person's subjective understanding," *id.*, at 230, and requires consideration of "the characteristics of the accused [in addition to] the details of the interrogation," *id.*, at 226.

without more, would presumably support the same conclusion. Now consider three officers, one of whom stands behind the pedestrian, another at his side toward the open sidewalk, with the third addressing questions to the pedestrian a foot or two from his face. Finally, consider the same scene in a narrow alley. On such barebones facts, one may not be able to say a seizure occurred, even in the last case, but one can say without qualification that the atmosphere of the encounters differed significantly from the first to the last examples. In the final instance there is every reason to believe that the pedestrian would have understood, to his considerable discomfort, what Justice Stewart described as the "threatening presence of several officers," *United States* v. *Mendenhall*, 446 U. S. 544, 554 (1980) (opinion of Stewart, J.). The police not only carry legitimate authority but also exercise power free from immediate check, and when the attention of several officers is brought to bear on one civilian the imbalance of immediate power is unmistakable. We all understand this, as well as we understand that a display of power rising to Justice Stewart's "threatening" level may overbear a normal person's ability to act freely, even in the absence of explicit commands or the formalities of detention. As common as this understanding is, however, there is little sign of it in the Court's opinion. My own understanding of the relevant facts and their significance follows.

When the bus in question made its scheduled stop in Tallahassee, the passengers were required to disembark while the vehicle was cleaned and refueled. App. 104. When the passengers returned, they gave their tickets to the driver, who kept them and then left himself, after giving three police officers permission to board the bus in his absence. *Id.*, at 77–78. Although they were not in uniform, the officers displayed badges and identified themselves as police. One stationed himself in the driver's seat by the door at the front, facing back to observe the passengers. The two others went to the rear, from which they worked their way for-

ward, with one of them speaking to passengers, the other backing him up. *Id.*, at 47–48. They necessarily addressed the passengers at very close range; the aisle was only 15 inches wide, and each seat only 18.[2] The quarters were cramped further by the overhead rack, 19 inches above the top of the passenger seats. The passenger by the window could not have stood up straight, *id.*, at 55, and the face of the nearest officer was only a foot or 18 inches from the face of the nearest passenger being addressed, *id.*, at 57. During the exchanges, the officers looked down, and the passengers had to look up if they were to face the police. The officer asking the questions spoke quietly. He prefaced his requests for permission to search luggage and do a body pat-down by identifying himself by name as a police investigator "conducting bus interdiction" and saying, " 'We would like for your cooperation. Do you have any luggage on the bus?' " *Id.*, at 82.

Thus, for reasons unexplained, the driver with the tickets entitling the passengers to travel had yielded his custody of the bus and its seated travelers to three police officers, whose authority apparently superseded the driver's own. The officers took control of the entire passenger compartment, one stationed at the door keeping surveillance of all the occupants, the others working forward from the back. With one officer right behind him and the other one forward, a third officer accosted each passenger at quarters extremely close and so cramped that as many as half the passengers could not even have stood to face the speaker. None was asked whether he was willing to converse with the police or to take part in the enquiry. Instead the officer said the police were "conducting bus interdiction," in the course of which they "would like . . . cooperation." *Ibid.* The reasonable inference was that the "interdiction" was not a consensual exercise, but one the police would carry out what-

---

[2] The figures are from a Lodging filed by respondents (available in Clerk of Court's case file). The Government does not dispute their accuracy.

ever the circumstances; that they would prefer "cooperation" but would not let the lack of it stand in their way. There was no contrary indication that day, since no passenger had refused the cooperation requested, and there was no reason for any passenger to believe that the driver would return and the trip resume until the police were satisfied. The scene was set and an atmosphere of obligatory participation was established by this introduction. Later requests to search prefaced with "Do you mind . . ." would naturally have been understood in the terms with which the encounter began.

It is very hard to imagine that either Brown or Drayton would have believed that he stood to lose nothing if he refused to cooperate with the police, or that he had any free choice to ignore the police altogether. No reasonable passenger could have believed that, only an uncomprehending one. It is neither here nor there that the interdiction was conducted by three officers, not one, as a safety precaution. See *id.*, at 47. The fact was that there were three, and when Brown and Drayton were called upon to respond, each one was presumably conscious of an officer in front watching, one at his side questioning him, and one behind for cover, in case he became unruly, perhaps, or "cooperation" was not forthcoming. The situation is much like the one in the alley, with civilians in close quarters, unable to move effectively, being told their cooperation is expected. While I am not prepared to say that no bus interrogation and search can pass the *Bostick* test without a warning that passengers are free to say no, the facts here surely required more from the officers than a quiet tone of voice. A police officer who is certain to get his way has no need to shout.

It is true of course that the police testified that a bus passenger sometimes says no, App. 81, but that evidence does nothing to cast the facts here in a different light. We have no way of knowing the circumstances in which a passenger elsewhere refused a request; maybe that has happened only

when the police have told passengers they had a right to refuse (as the officers sometimes advised them), *id.*, at 81–82. Nor is it fairly possible to see the facts of this case differently by recalling *INS* v. *Delgado*, 466 U. S. 210 (1984), as precedent. In that case, a majority of this Court found no seizure when a factory force was questioned by immigration officers, with an officer posted at every door leading from the workplace. *Id.*, at 219. Whether that opinion was well reasoned or not, the facts as the Court viewed them differed from the case here. *Delgado* considered an order granting summary judgment in favor of respondents, with the consequence that the Court was required to construe the record and all issues of fact favorably to the Immigration and Naturalization Service. See *id.*, at 214; *id.*, at 221 (STEVENS, J., concurring). The Court therefore emphasized that even after "th[e] surveys were initiated, the employees were about their ordinary business, operating machinery and performing other job assignments." *Id.*, at 218. In this case, however, Brown and Drayton were seemingly pinned-in by the officers and the customary course of events was stopped flat. The bus was going nowhere, and with one officer in the driver's seat, it was reasonable to suppose no passenger would tend to his own business until the officers were ready to let him.

In any event, I am less concerned to parse this case against *Delgado* than to apply *Bostick*'s totality of circumstances test, and to ask whether a passenger would reasonably have felt free to end his encounter with the three officers by saying no and ignoring them thereafter. In my view the answer is clear. The Court's contrary conclusion tells me that the majority cannot see what Justice Stewart saw, and I respectfully dissent.