**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Coleman DEDE, Defendant–Appellant,**

**Jamual MOORE, Defendant–Appellant.**

**Nos. 01–3605, 01–3614, 01–3616, 01–3618.**

United States Court of Appeals, Sixth Circuit.

Dec. 8, 2003.

---

734

JosephJoseph P. Schmitz, Asst. U.S. Attorney, U.S. Attorney's Office, Cleveland, OH, for Plaintiff–Appellee.

Stan Stern, Pacific Palisades, CA, Steven L. Dobbs, Los Angeles, CA, for Defendants–Appellants.

Before KEITH, MARTIN, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

After entering conditional guilty pleas on narcotics trafficking charges, Coleman Dede and Jamual Moore appealed the trial court's denial of their motions to suppress evidence allegedly seized in violation of their rights under the Fourth and Fourteenth Amendments. Because the police officers had probable cause to believe that Dede and Moore had committed a crime at the time of the search, we hold that the officers did not violate the Fourth Amendment and accordingly we AFFIRM.

## I.

### A.

On October 17, 2000, members of the Cleveland Hopkins International Airport Interdiction Group, a task force designed to reduce the flow of narcotics into Cleveland and made up of representatives from various law enforcement agencies, observed passengers deplaning from Southwest Airlines Flight 1485. The flight originated in Ontario, California, a suburb of Los Angeles. Based on prior success in intercepting drug couriers from this flight, members of the interdiction group routinely observed its passengers.

Kirk Johns (of the Drug Enforcement Agency) and Debra Harrison (of the Cleveland Police Department) observed the defendants walking from the arrival gate of Flight 1485 and noticed the following. Dede and Moore each carried two bags and each of them wore business suits, which seemed strange to the officers because Flight 1485 arrived at midday and the passengers on the flight usually dressed casually. The suits worn by the defendants also were ill-fitting. Johns and Harrison followed the defendants through the concourse, noticing that each man walked quickly and that they did not speak to one another. The officers also observed that Dede and Moore each had a bulge across their lower backs.

When the defendants stopped briefly at an airport newsstand in the concourse, they did not buy anything and did not speak to anyone. Moore stood at the newsstand entrance and looked out into the concourse, while Dede stood near the counter and also looked out into the concourse. The officers perceived this activity–or lack of it–as a common counter-surveillance technique used by drug couriers. After approximately twenty seconds, the defendants left the newsstand, then walked to the airport exit. In doing so, they hurriedly approached an escalator and walked down it without "standing and riding." After reaching the bottom of the escalator, the two men walked outside and looked for a taxi.

As the defendants waited for a cab, Johns and Harrison approached them from the rear and identified themselves. Moore agreed to speak with Officer Johns, who asked him for his airline ticket and identification. Moore produced the airline ticket and a California Identification Card (not a driver's license), both in the name of Markus Miller. Noticing that the card was flimsy with blurred, offset type and a

crooked picture, Johns doubted the authenticity of the identification card. He also noticed that Moore had purchased a one-way ticket, which cost as much as a round-trip ticket. When asked why he had traveled to Cleveland, Moore said he came to see Dede's "girl." Although Johns "was 100 percent sure that [Moore's] ID was not real," he did not arrest Moore for presenting a false identification.

Officer Harrison took a similar approach with Dede. She asked Dede for his airline ticket, which was a one-way ticket from Ontario that had been purchased with cash, then asked for his identification, which was a California Identification Card that Harrison also suspected to be fake. When Harrison asked Dede why he had traveled to Cleveland, Dede gave inconsistent answers–first claiming that he had come to visit an aunt dying of cancer, later claiming (after overhearing Moore's reason for coming to Cleveland) that he was visiting his "girl." Dede initially told Harrison that he would stay two weeks, but then recanted and said he was unsure how long he would stay. Although Harrison believed that she could have arrested Dede for making a false statement to a police officer and for presenting false identification, she elected not to do so at that time.

The officers next requested, and received, Dede's and Moore's permission to search their carry-on bags. The search produced nothing unusual. The officers next asked the defendants to consent to a pat-down search, but Dede refused and immediately instructed Moore to refuse as well. The officers then thanked the defendants and told them they were free to leave. The defendants bent down to pick up their bags–at which time the officers again noticed the bulges in their lower backs–and proceeded to enter an awaiting taxi.

While the defendants sat in their taxi and waited for it to leave, the officers discussed their observations with other members of the Task Force and reconsidered their decision not to detain Dede and Moore. Johns and Harrison shared what they each had observed, including what they perceived to be false identification cards and, in the case of Dede, false statements. On reconsideration, the officers decided to detain Dede and Moore and to seek a warrant to search them. They ordered the defendants to leave the taxi, then placed them in handcuffs.

The officers detained the defendants in the Task Force's office at the airport and obtained warrants from a state-court judge approximately three hours later. The searches revealed that the defendants had one-kilogram bricks of cocaine strapped to each thigh. The bulges around their lower backs did not result from drugs, it turned out, but from four layers of clothing, presumably worn to conceal the cocaine strapped to their legs. The officers arrested the defendants for drug trafficking.

A federal grand jury indicted Dede and Moore on two counts–(1) conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841 & 846 and (2) possession with intent to distribute 500 or more grams of cocaine in violation of 21 U.S.C. § 841(a)(1). Both defendants moved to suppress the cocaine on Fourth Amendment grounds. After an evidentiary hearing, the district court denied the motions, concluding (among other things) that probable cause existed to arrest Dede and Moore when they were asked to leave the taxi. On appeal, we review the district court's factual findings for clear error and review its legal conclusions de novo. *See United States v. Waldon,* 206 F.3d 597, 602 (6th Cir.2000).

## II.

Of the many Fourth Amendment principles competing for attention in this case, three of them suffice to resolve this one dispute. First, a "consensual encounter ... implicates no Fourth Amendment interest." *Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage–provided they do not induce cooperation by coercive means." *United States v. Drayton,* 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Second, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Third, because "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment ... a search incident to the arrest requires no additional justification." *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *see Gustafson v. Florida,* 414 U.S. 260, 266, 94 S.Ct. 494, 38 L.Ed.2d 427 (1973) ("We hold, therefore, that upon arresting petitioner for the offense of driving his automobile without possession of a valid operator's license, and taking him into custody, [the officer] was entitled to make a full search of petitioner's person incident to that lawful arrest."). Taken together, these three principles license the officers' conduct in this case.

### A.

■ Until the officers removed Dede and Moore from the taxi, the encounter between the officers and the defendants was entirely consensual, as the district court correctly determined. The officers "pose[d] questions," *Drayton,* 536 U.S. at 201, 122 S.Ct. 2105, which Dede and Moore answered; "ask[ed] for identification," *id.,* which Dede and Moore produced; and "request[ed] consent to search luggage," *id.,* which Dede and Moore provided. This refrain of questions and answers is exactly the kind of consensual interaction between government agents and individuals that *Drayton* approved. That Dede and Moore declined to consent to a "pat-down" search at the end of this meeting serves only to highlight the consensual nature of the initial encounter.

### B.

By the time the officers removed Dede and Moore from the taxi, handcuffed them and detained them, the officers had probable cause to believe that each of them had committed a criminal offense. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) ("[P]robable cause [exists when] ... the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."). This probable cause, which we explain below, not only justified the arrests but also justified the searches incident to each defendant's arrest.

■ As to Moore, the officers at a minimum had probable cause to believe he had "[d]isplay[ed] ... or possess[ed] an[ ] identification card ... knowing the same to be fictitious, or ... altered," in violation of a Cleveland ordinance. Cleveland, Ohio Codified Ordinances No. 435.04 ("No person shall: (a) Display, or cause to be displayed, or possess any identification card, [or] driver's ... license ... knowing the same to be fictitious, or to have been ... altered...."). Officer Johns "was 100% sure" that Moore's California Identification

Card "was not real," and the objective facts known to him supported this confidence. The card was flimsy and blurred, had misaligned type and included a crooked picture. These undisputed facts gave the officers an objectively justifiable basis to arrest Moore for presenting a false identification card, whether or not they had probable cause at this point to believe he was trafficking drugs.

■ That the officers chose to arrest Moore for drug trafficking rather than the presentation of a false identification does not alter this analysis. "Subjective intentions," the Supreme Court has instructed, "play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In *Whren* the Court held that officers who have probable cause to enforce one set of laws (traffic laws) may, without violating the Fourth Amendment, rely on that determination to pursue their suspicions concerning another set of laws (drug-trafficking laws). *Id.* at 812–13, 116 S.Ct. 1769; *see also Arkansas v. Sullivan,* 532 U.S. 769, 771–72, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001) (per curiam) (holding that a custodial arrest for a traffic violation and search incident to arrest do not violate the Fourth Amendment just because an officer had a subjective pretextual motivation for making the stop); *United States v. Herbin,* 343 F.3d 807, 809 (6th Cir.2003); *United States v. Anderson,* 923 F.2d 450, 457 (6th Cir. 1991) ("Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists.").

In this case, the officers did not arrest Moore for possessing a false identification after the initial encounter and they did not intend to arrest him for drug trafficking when they asked him to exit the taxi. They instead sought a warrant to conduct a search of him before effecting a formal arrest. Even if we grant that the three-hour detention required to obtain the warrant together with the handcuffing of Moore amounted to a custodial arrest, the officers' reluctance in making a formal arrest–and the subjective view that they lacked probable cause, which apparently underlay their hesitance–does not invalidate the seizure. The fact is, the officers had an objectively-justifiable basis for arresting Moore when they seized him–the presentation of a false identification–and that is all that matters. If, as *Whren* holds, a pretextual seizure does not offend the Fourth Amendment, neither does an unnecessarily-reluctant one. *See Soltesz v. City of Sandusky,* 49 Fed.Appx. 522, 526 (6th Cir.2002) ("Although finding that the police officers had no probable cause to arrest Soltesz for threatening domestic violence, . . . the officers had probable cause . . . to detain [him] on charges of menacing . . . . [and][t]he fact that the police did not themselves contemplate a charge of menacing when arresting Soltesz does not so extinguish the probable cause for such an action that a Fourth Amendment violation results."); *United States v. Bookhardt,* 277 F.3d 558, 567 (D.C.Cir.2002) (holding that "if a police officer arrests a defendant on a ground that ultimately proves invalid, the arrest is nonetheless lawful if the same officer had probable cause to arrest the defendant for a different offense"); *id.* at 566 ("were we to hold otherwise, we would do no more than create an incentive for the police to routinely charge every citizen taken into custody with every offense they can think of") (quotation and citation omitted); *cf. Anderson,* 923 F.2d at 457 ("[K]nowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants.").

Whether probable cause existed to arrest Dede presents a question that is hard-

er in one sense and easier in another. It is a more difficult question because, in contrast to Moore, the officers did not introduce into evidence Dede's identification card and did not specify why they thought the card was inauthentic. While their conclusion that Dede's identification card was fake is relevant and while the officers realized that Dede was traveling with someone who clearly possessed a fake identification card, the absence of further evidence precludes us from concluding that probable cause existed to arrest Dede for presenting a false identification.

■ Dede's case is the easier of the two, however, in a different sense. Dede not only arrived on a flight that had yielded frequent drug arrests in the past, wore ill-fitting clothing (allowing for the concealment of drugs underneath), had a bulge on his back (suggesting something unusual hidden beneath his clothes), and presented an unusual-looking California Identification Card, but (as the district court found) Dede also purchased a one-way ticket with cash and gave inconsistent answers regarding the reason for his stay and the length of it. All facts considered, we agree with the district court that probable cause existed to arrest Dede for drug-trafficking.

### C.

■ When, after leaving the taxi, the officers handcuffed Dede and Moore and took them into custody for three hours, they effected "custodial arrests" of them, which justified a search incident to their arrests. That the officers, in the district court's words, "displayed continuing reluctance to deprive the defendants of their Fourth Amendment rights ... [by] securing a warrant before conducting any type of search" does not require us to examine the adequacy of the warrants. "It is the fact of the lawful arrest," the Supreme Court has held, "which establishes the authority to search." *Robinson,* 414 U.S. at 235, 94 S.Ct. 467. And "in the case of [ ] lawful custodial arrest[s]," such as the arrests here, "a full search ... is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.; see United States v. Edwards,* 415 U.S. 800, 803, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) ("It is also plain that searches and seizures that could be made on the spot at the time of arrest may be legally conducted later when the accused arrives at the place of detention."). On this record, the district court correctly concluded that the evidence obtained from the searches of Dede and Moore should not be suppressed.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.