NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4389
_____

UNITED STATES OF AMERICA

v.

MAURICE PETERKIN,

Appellant
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Criminal Action No. 3-07-cr-00919-001)
District Judge:  Honorable Joel A. Pisano
_____

Submitted Under Third Circuit LAR 34.1(a)
September 21, 2010
_____

Before:  MCKEE, Chief Judge, AMBRO, and CHAGARES, Circuit Judges

(Opinion filed September 29, 2010)
_____

OPINION
_____

AMBRO, Circuit Judge

In July 2009, appellant Maurice Peterkin was convicted of one count of

distribution of methamphetamine and one count of distribution and possession with intent

to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(c) and 18 U.S.C. § 2. On appeal, he argues that the District Court erred in denying his motions to (1) suppress the evidence of the methamphetamine and marijuana and (2) compel handwriting samples from the municipal court judge who signed three search warrants for vehicles, the execution of which resulted in the discovery of the methamphetamine. We affirm the District Court's rulings in both instances.

## I. Background

On September 12, 2007, Detectives James Lascik, Lindsay Cooper, and Ray Smink were conducting surveillance at the Molly Pitcher Service Area on the New Jersey Turnpike. They were dressed in plain clothes and driving an unmarked van. While circling the service area, the detectives spotted a green Acura with tinted windows driving slowly up and down the aisles of the car parking lot in front of the rest area. The detectives then observed the Acura leave the lot, head toward the gas station area, and park in the corner of the gas station parking lot. The occupants of the Acura did not use the rest area or the gas station. The driver of the Acura, Elvis Durovic, got out of his car, looked around, and walked quickly toward the truck parking lot. He walked though the rows of parked trucks until he reached Peterkin's tractor-trailer where he stopped and stared at the trailer's refrigeration unit.

After spotting the Acura, the detectives continued to follow in the unmarked van. When Durovic stopped at Peterkin's tractor-trailer, the detectives pulled the van into a parking spot facing Durovic. Peterkin got out of the cab and he and Durovic greeted each

2

other and began to talk. After a few moments of conversation, however, the two men noticed the unmarked van. They stopped talking and stared at the van.

The detectives then left the van and approached the men. Detectives Lascik and Smink identified themselves, showed their badges, and began asking them questions separately (they were about ten feet apart). Durovic responded aggressively to questioning, denied that he had driven around the parking lot or that he knew Peterkin, and kept his eyes on Peterkin and Smink while attempting to listen to what they were saying. At the same time, Peterkin told Smink that he knew Durovic and had met him at the service station on a prior occasion.

Lascik and Smink conferred and discovered the discrepancy in the two stories, arousing their suspicions. Lascik then took Durovic and Peterkin's identification back to the van to run a background check.

While Lascik was running the check, Smink continued speaking with Durovic, and Detective Cooper began talking to Peterkin. Because it appeared that Durovic was attempting to eavesdrop on their conversation, Cooper asked Peterkin to step around to the rear of the trailer. Once there, Cooper asked Peterkin whether he knew Durovic and whether the trailer was loaded or empty. Peterkin said that he met Durovic three days prior at the service station and that the trailer was empty. Then, without further prompting, Peterkin opened the back door of the trailer. Looking through the open door, Cooper saw that the trailer was not carrying a load, but did see a black duffle bag. When he asked Peterkin what was in the duffle bag, Peterkin responded "food product." Then, again without prompting, Peterkin unzipped the bag and showed the contents to Cooper.

Inside, Cooper saw numerous shrink-wrapped bundles that appeared to be an illegal substance (later determined to be marijuana). He then arrested Peterkin and instructed Detective Smink to arrest Durovic.

The Acura and tractor-trailer were towed to the New Jersey State Police impound. After a narcotic-sniffing dog alerted at both, the detectives obtained the necessary search warrants. On execution of the warrants, the detectives recovered methamphetamines from the trailer's refrigeration unit. They also found a tool used to take apart the unit and a backpack containing $7,000 in cash.

Peterkin was charged as noted above. Before trial, he moved to suppress all of the physical evidence, contending that (1) the detectives did not have reasonable suspicion to justify stopping and seizing him at the moment they separated him from Durovic for questioning, and (2) Peterkin's opening of the trailer door and duffle bag was not voluntary. Peterkin also moved to compel the municipal court judge who issued the search warrants to provide handwriting samples, apparently in an effort to verify their authenticity. The District Court denied both motions. Peterkin appeals.

## II. Discussion

### A. Motion to Suppress

We review the District Court's order denying the motion to suppress for "clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts." *United States v. Lafferty,* 503 F.3d 293, 298 (3d Cir. 2007) (quoting *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

4

Peterkin argues that the District Court erred in denying his motion to suppress. First, he claims that he was "stopped" without reasonable suspicion, in violation of *Terry v. Ohio*, 392 U.S. 1 (1968). We disagree.

"Obviously, not all personal intercourse between policemen and citizens involve 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16; *see also United States v. Valentine,* 232 F.3d 350, 358 (3d Cir. 2000) (stating that, for a seizure to occur, "the police must apply physical force to the person being seized or, where force is absent, have the person seized submit to a show of police authority"). "Mere police questioning does not constitute a seizure" and "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *United States v. Williams,* 413 F.3d 347, 354 (3d Cir. 2005) ("Merely approaching an individual, whether standing or in an automobile, does not constitute a seizure under the Fourth Amendment.").

It is undisputed that the detectives did not restrain Peterkin with physical force. Therefore, we must decide whether they forced him to submit to a show of police authority.

When the detectives first approached Peterkin and Durovic, they identified themselves as law enforcement officers and showed their badges. They also had their weapons holstered at their hips. This initial interaction is not such a "show of authority" to constitute a seizure. As the Supreme Court held in *United States v. Drayton*, 536 U.S.

5

194 (2002), it is "well known to the public" that law enforcement officers are armed. *Id.* at 205-05. Additionally, it may be "cause for assurance, not discomfort," that officers are easily identifiable by displaying a badge or wearing a uniform. *Id.* Here, there is no evidence that the detectives acted aggressively, brandished their weapons, made threatening movements, or did anything other than calmly approach the two men and ask to speak with them.

When the detectives then asked to see Peterkin and Durovic's identifications and to speak with them separately, this did not change the nature of the encounter. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *Id.* at 200. In addition, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, [and] ask for identification[,]' without running afoul of the Fourth Amendment's prohibitions.'" *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009). Here, as in *Smith*, the detectives asked for identification and began questioning the two men. The fact that the detectives in this case requested that Peterkin answer questions apart from Durovic, and separated them by about ten feet, does not convert an otherwise voluntary encounter into a seizure under the Fourth Amendment.

The first moment at which Peterkin may have been seized was when Detective Lascik took Peterkin's identification back to the van to run a background check. By that time, however, Peterkin and Durovic had already given the detectives conflicting stories, including whether they knew each other. This inconsistency, together with the

6

detectives' earlier observations of their unusual behavior, was enough to create reasonable suspicion to support a *Terry* stop. *See United States v. Givan,* 320 F.3d 452, 458-59 (3d Cir. 2003) (holding that receiving conflicting stories from the driver and passenger of a stopped car about their travel gave the officer reasonable suspicion to extend the *Terry* stop); *United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003) (holding that, after receiving conflicting stories from a driver and passenger, the officer had reasonable suspicion to expand the scope of the *Terry* stop and conduct background checks on them both).

Second, Peterkin claims that his opening the door to the trailer and showing the detective the duffle bag containing marijuana was not "voluntary." He notes that there were no witnesses to this event other than Cooper, and suggests that he was "ordered" or "intimidated" by Cooper into opening the trailer and the duffle bag. Peterkin asserts that District Court erred in accepting the account of his actions given by Cooper because the account defies logic - Peterkin would not have voluntarily opened either the trailer or the duffle bag knowing it would reveal marijuana.

As Peterkin presented no evidence to contradict Detective Cooper's testimony (Peterkin did not testify at the suppression hearing), we hold that he has not demonstrated that the District Court committed clear error in crediting Cooper's version of events. Therefore, Peterkin's Fourth Amendment claim fails.

**B. Motion to Compel Handwriting Sample**

We review a District Court's denial of a discovery motion for abuse of discretion. *Lloyd v. Hovensa, LLC.,* 369 F.3d 263 (3d Cir. 2004).

7

Peterkin argues that the District Court abused its discretion in denying his motion to compel handwriting samples of Municipal Court Judge Edward Herman, who issued the search warrants for the vehicles. Peterkin argues that he was never able to verify the authenticity of the warrants because he was never provided with the originals and the warrants contained no time stamp to indicate when they were signed or facsimilie tags verifying that the warrants were sent to Judge Herman via facsimile, signed, and returned via facsimile.

This argument underwhelms. After initially denying Peterkin's motion to compel, the District Court ordered service of a subpoena to compel the production of 20 random orders signed by Judge Herman. In response, in lieu of filing a motion to quash the subpoena, Judge Herman wrote a letter to Peterkin's attorney indicating that he (Herman) recalled signing the warrants and verifying that the signatures on the warrants were his. He noted that the absence of facsimile tags was because he executed the search warrants in person.[1]

In light of this evidence, we hold that the District Court did not abuse its discretion when it denied Peterkin's motion to compel.

*  *  *  *  *

For the reasons discussed above, we affirm the District Court's rulings.

---

[1] There is some confusion in the record about whether the warrants were faxed or delivered to Judge Herman for his signature. However, in light the fact that Peterkin did not dispute the authenticity of Judge Herman's letter, we believe this confusion to be irrelevant.