IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 22, 2005

## GARY RANDALL YARNELL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Blount County**
**No. C-11964     D. Kelly Thomas, Jr., Judge**

---

**No. E2004-01762-CCA-R3-PC  Filed August 15, 2005**

---

Gary Randall Yarnell, the petitioner, appeals the Blount County Circuit Court's denial of his petition for post-conviction relief.  The lower court found his allegations of ineffective assistance of counsel and unknowing and involuntary guilty pleas unsupported by the evidence and denied relief.  Because we are unpersuaded of error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Robert M. Cohen, Maryville, Tennessee, for the Appellant, Gary Randall Yarnell.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Rocky Young, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In 1998, the petitioner pleaded guilty to first degree murder, especially aggravated robbery, and especially aggravated burglary.  He received concurrent sentences of life imprisonment with the possibility of parole, 15 years, and 12 years respectively.  From the record, we glean that his convictions stemmed from the 1996 baseball-bat bludgeoning death of Steven Mote.  The victim's body was stuffed into the trunk of his own vehicle, and that vehicle was driven to a secluded area of Douglas Lake and set on fire.

The TVA Police unit on duty at Douglas Lake was dispatched to the scene of the fire.  The record before us contains a TVA Police Uniform Incident Report in which the following details appear:

INITIAL OBSERVATIONS OF OFFICER LOVIN:

On 10/15/96, at approximately 0732 hours, while in route to the fire scene, I observed a white male, later identified as [the petitioner], walking on Highway 338 in Sevier County near the scene. [The petitioner] was dressed in brown or light black dress pants, a buttonup shirt, a cap, and brown or black dress shoes. [The petitioner] stated that he was going to work, and that he worked at Tennessee Cylinder Head, on Chapman Highway, in Knoxville. I ask[ed] where he had been. [The petitioner] stated that he had stayed with his brother the night before, who he said lived just across the hill, and had gotten up early to go meet his girlfriend. [The petitioner] stated that his girlfriend was supposed to pick him up. [The petitioner] stated that she had not show[n] up, so he decided to walk down the road to see if he could find her anywhere. [The petitioner] stated that he was going to the Lakeway Market to call his sister and have her come and take him to work, if he could not find his girlfriend. Knoxville Communications verified that there were no wants or warrants on [the petitioner]. After this, I proceeded to the scene of the fire.

　　　. . . .

After the investigators took over the crime scene, Capt. Majors informed me to go back to where I had seen [the petitioner]. I was advised to locate[ and] to bring [the petitioner] back to the scene. I was unable to locate [the petitioner] in the area of Douglas Dam. I proceeded to [the petitioner's] residence, . . . [and w]hile at the residence, I spoke with [the petitioner's] mother . . . [who] admitted that her son had called her this morning, around 0800 hours from the Lakeway Market in Sevier County. She advised me that her son told her that he had called his sister to come to pick him up and that his sister was on her way.

Eventually, law enforcement officers located the petitioner, and he gave an inculpatory statement to the police implicating himself and a female companion, Candace McCarter, in the robbery and murder of the victim. The petitioner admitted to the police that he struck the victim with a bat, but the petitioner maintained that he did not mean to kill the victim. Based on the circumstances of the homicide, the state initially sought the death penalty but later agreed to withdrawn its notice in exchange for the petitioner's plea.

Slightly less than one year after entry of his guilty pleas, the petitioner filed a *pro se* petition for post-conviction relief. Thereafter, the petition was amended several times, and five different attorneys were appointed to represent the petitioner, four of whom were permitted to withdraw. An evidentiary hearing was conducted on May 13 and 14, 2004; the litigated issues were

ineffective assistance of counsel, involuntary guilty pleas, prosecutorial misconduct, illegal confession, and lack of culpable mental state.

At the post-conviction hearing, the petitioner's lead trial counsel testified about his appointment to represent the petitioner. Inasmuch as the state was seeking the death penalty, defense co-counsel was also appointed to work on the case. Lead counsel was asked about the initial stop of the petitioner on Highway 338, near the fire scene. Trial counsel had not filed a pretrial motion challenging the stop as illegal, and lead counsel testified that he saw no basis to attack the stop inasmuch as the encounter took place in a public place and no seizure occurred.

Lead counsel had filed a pretrial motion to suppress the statements that the petitioner gave to law enforcement officers. The motion alleged that the petitioner was first interviewed on May 15, 1996, and that during the interview he requested that counsel be present during any further questioning. The petitioner provided the name of his attorney, and because the petitioner could not reach his attorney, the interview concluded at that time. According to the suppression motion, approximately three days later, an officer contacted the petitioner directly and requested that the petitioner go to the Blount County Sheriff's Department to be photographed and provide fingerprints. The request, the motion alleged, was a ruse to interview and obtain evidence from the petitioner without the presence of counsel, and indeed, the petitioner ultimately made inculpatory statements to the officers without the benefit of counsel. Lead counsel testified that part of the plea agreement with the state required the defense to withdraw that motion; consequently, the suppression motion was never litigated.

Regarding investigation into the petitioner's culpable mental state, lead counsel acknowledged that no mental evaluation was performed. He recalled, however, that co-counsel contacted an expert on the effects of marijuana and other intoxicants to explore a possible defense. The facts, however, appeared to show considerable deliberation and activity, including clubbing the victim, stealing his property, loading up the victim's car and placing the victim's body in the trunk, driving to another county, and setting the car on fire. As a result, lead counsel was not convinced that voluntary intoxication was a viable defense. Likewise, lead counsel did not believe that it was possible to successfully argue criminally negligent homicide to a jury. Even so, lead counsel specifically recalled discussing lesser included offenses with the petitioner, although counsel was not encouraging about the prospect of a lesser included offense conviction.

Lead counsel was shown a copy of an undated statement handwritten by a female who was an inmate at the Blount County Jail at the same time the petitioner's female co-defendant was detained. The writer reports that on September 1, 1997 – before the petitioner pleaded guilty – co-defendant, Candace McCarter, made sexual advances toward the writer, assaulted the writer, and admitted holding the baseball bat and killing the victim. Lead counsel could not recall ever receiving that exculpatory statement from the state. Had counsel been aware of the statement, counsel said that he would have discussed it with the petitioner and could have used it to impeach the co-defendant had she testified.

The state's death penalty notice had cited three aggravating circumstances: that the murder was especially heinous, atrocious, or cruel; that the murder was knowingly committed during the perpetration of enumerated felonies; and the body of the victim was knowingly mutilated after death. Lead counsel testified that he had not filed any motions attacking the aggravating factors as unconstitutionally vague.

The petitioner, who was 23-years old when the victim was killed, testified about being stopped by the TVA officer as he was walking down the road near Douglas Dam. The officer drove past the petitioner but then turned around and stopped where the petitioner was standing. According to the petitioner, the officer "got out of the vehicle and patted [him] down and asked for [his] I.D." The petitioner did not have a driver's license, but he supplied his name and address. The officer "phoned" in the information and asked where the petitioner had been. The petitioner told the officer that he had spent the night at his brother's house and was walking to Lakeway Market. The officer told the petitioner to stay where he was until the information was checked. The petitioner estimated that the officer detained him "about five minutes."

The petitioner's next contact with law enforcement was later that night when several officers came to his mother's house and questioned him about Candace McCarter. At the officers' request, the petitioner drove to the TBI office to discuss the matter further. The petitioner said that at a certain point, he told the officers he was uncomfortable and wanted his attorney present. The petitioner was unable to reach his attorney that evening, and he left the TBI office with the agreement that he would contact the officers after he had spoken with his attorney. The following day, the petitioner learned that his attorney was out of town and would not return for several days. The petitioner then called one of the officers to advise that his attorney was out of town but that the petitioner would ask the attorney to call the officers when he returned.

Two days later, one of the investigators first contacted the petitioner's mother and later the petitioner to ask that he provide his fingerprints and be photographed. The petitioner was at work and told the investigator that he had no transportation, whereupon the investigator arranged for transportation. During that meeting, the petitioner gave a statement to one of the investigators. The petitioner agreed that counsel had filed a motion to suppress that statement.

The petitioner testified that he and counsel had several discussions about pleading guilty to avoid the death penalty. The petitioner rejected the idea of pleading and agreeing to a sentence of life without the possibility of parole. When, however, an offer was made involving a sentence of life with the possibility of parole, the petitioner, the petitioner's family members, and counsel met to discuss the offer. The petitioner said that he asked counsel about lesser included offenses to which counsel responded that "there is no need to worry about a lesser-included offense because there is no way we can keep you from death row." Counsel showed the family members photographs of the victim and the crime scene. The petitioner said that the pictures profoundly affected his family. In addition, counsel told the petitioner that the co-defendant McCarter was considering a plea offer involving testifying against the petitioner.

4

At the time of the plea discussions, the petitioner had been in pretrial confinement for almost two years. He testified that he had become depressed and had suicidal thoughts. The petitioner claimed that when he mentioned a psychological evaluation, counsel resisted the idea on the basis that the petitioner was "competent." Because of his depression, the petitioner said that his plea was not knowing or voluntary. Furthermore, he maintained that counsel never discussed or explained to him the requirements that first degree murder be intentional and premeditated. As for witnesses who may have heard the co-defendant admit to killing the victim, the petitioner said that counsel never advised him of such individuals.

The final post-conviction witness was Detective James Widener, who participated in the homicide investigation. He described the murder scene and the area of Douglas Lake where the vehicle was set on fire. He also was asked about the evidence in the case and about the inculpatory statement the petitioner had given to the officer.

From the evidence and testimony presented, the post-conviction court made the following findings: (1) Trial counsel were not ineffective for failing to challenge the officer's stop of the petitioner in the vicinity of the fire inasmuch as no legal basis existed to contest the brief investigatory stop; (2) the state's failure to disclose exculpatory evidence regarding the statement of the inmate to whom co-defendant McCarter had confessed to the homicide did not adversely impact the outcome of the trial; (3) had the motion to suppress the petitioner's statement been pursued, it would not have been successful because the statement was voluntarily made after the petitioner had initiated a conversation with law enforcement; (4) the petitioner failed to demonstrate that he was suffering from any mental or cognitive problems that undermined the voluntariness of his guilty plea; (5) the evidence refutes the petitioner's claim that drug and alcohol use and depression rendered him incapable of intentional, premeditated homicide; and (6) the threat of receiving the death penalty would not have abated even had one of the statutory aggravators been successfully challenged. Accordingly, the post-conviction court dismissed the petition.

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the lower court's findings of fact are reviewed *de novo* with a presumption of correctness that may only be overcome if the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner challenges the effective assistance of counsel, he has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below the range of competence demanded of attorneys in criminal cases. *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994). When it is alleged that the ineffective assistance of counsel resulted in a guilty plea, the burden is upon the defendant to establish the prejudice prong of *Strickland* by

5

proving that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985). On review, there is a strong presumption of satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995). If prejudice is absent, there is no need to examine allegations of deficient performance. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

Two of the petitioner's complaints relate to pretrial motions that he insists should have been filed and/or litigated before a plea agreement was reached. First, the petitioner assails trial counsel's performance in not raising the legality of the investigatory stop by Officer Lovin; second, the petitioner argues that trial counsel was ineffective in failing to pursue the motion, which had been filed, to suppress the petitioner's incriminating statements to law enforcement. To prevail on either or both of these ineffective-assistance complaints, the petitioner must demonstrate that the motions were meritorious. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583 (1986) (where failure to litigate suppression is basis of ineffectiveness claim, defendant must also prove suppression motion is meritorious).

We review *de novo* the post-conviction court's legal conclusion that no basis in the law existed to challenge Officer Lovin's stop. *See Fields*, 40 S.W.3d at 458. The petitioner, we note, seemingly frames the issue in terms of whether a "seizure" occurred when he was stopped. However, even if the petitioner was constitutionally "seized," the matter does not end. He must further demonstrate prejudice in the post-conviction context by proving that the "seizure" was unreasonable.

When a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen, it violates the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution. Not every encounter between police officers and citizens is a "seizure," however. *State v. Randolph*, 74 S.W.3d 330, 338 (Tenn. 2002). A seizure occurs only when an officer restrains the liberty of an individual by means of physical force or show of authority. *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). The courts have recognized three distinct types of police-citizen interactions: (1) a full scale arrest supported by probable cause; (2) a brief investigatory detention supported by reasonable suspicion; and (3) a brief police-citizen encounter, which requires no objective justification. *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000).

A law enforcement officer does not violate the Fourth Amendment by merely approaching a person in a public place and posing a question. *United States v. Drayton*, 536 U.S. 194, 200, 122 S. Ct. 2105, 2110 (2002). Even if an officer has no basis for suspecting a crime is being committed, he or she may pose questions or ask for identification, provided he or she does not induce cooperation by coercive means. *Id.*, 122 S. Ct. at 2110; *see Daniel*, 12 S.W.3d at 425. To determine if an interaction between an officer and an individual is a seizure or a consensual encounter, the court must consider all the surrounding circumstances and ascertain whether the "police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S.

6

429, 439, 111 S. Ct. 2382, 2389 (1991).

In this case, from Officer Lovin's account of the encounter, we discern that he stopped the petitioner in a public place on Highway 338 near the fire scene, inquired where the petitioner had been and where he was going, obtained personal identification information from the petitioner, checked the information, and then proceeded to the scene of the vehicle fire. According to the petitioner's testimony, the encounter lasted "about five minutes," during which time he was "patted down," asked for identification, asked where he had been and where he was going, and was told to "stay" until the information was verified.

In our opinion, it is unnecessary to engage in a protracted analysis whether the encounter constituted a brief investigatory detention or a brief police-citizen interaction. Even viewed as a brief investigatory detention, Officer Lovin acted reasonably. Officer Lovin encountered the petitioner in the vicinity of the vehicle fire. The petitioner was wearing "dress pants," a "buttonup shirt," and "dress shoes," and he claimed to be headed to work at Tennessee Cylinder Head on Chapman Highway. Under the circumstances, Officer Lovin acted reasonably in asking for identification and detaining the petitioner no longer than necessary to verify the information. *See State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002) (detention of the person must last no longer than necessary to effectuate the purpose of the stop). Moreover, it plainly appears that Officer Lovin employed the least intrusive means reasonably available to investigate his suspicions in a short period of time, after which the detention promptly terminated. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983). Consequently, we agree with the post-conviction court that Officer Lovin's stop of the petitioner could not have been successfully challenged had a suppression motion been filed; therefore, the petitioner failed to sustain his claim of ineffective assistance of counsel on this basis.

Finally, on this claim we are at a loss to discern how a successful suppression motion would have benefitted the petitioner. No evidence was discovered or seized from the petitioner during his encounter with Officer Lovin. The petitioner's incriminating statements were not made until several days after the encounter with Officer Lovin; the intervening events would have purged or attenuated any illegal detention. *See State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996). As for Officer Lovin learning the petitioner's identity, the record shows that other investigative efforts underway would inevitably have led law enforcement to the petitioner via the co-defendant McCarter. *See Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501 (1984).

Regarding the motion that was filed to suppress the petitioner's incriminating statements, the petitioner, likewise, has not shown that trial counsel was ineffective in failing to pursue the motion. First, the petitioner has not demonstrated that counsel's actions were objectively unreasonable – that is, outside the range of competence demanded of attorneys in criminal cases. Lead counsel testified that the plea agreement required that the suppression motion be abandoned in exchange for the state withdrawing its request for the death penalty. Trial counsel's concerns that the state would likely obtain the death penalty if the case proceeded to trial were obviously valid, and the state could properly insist on withdrawal of the suppression motion as a condition of avoiding

7

the death penalty.

Second, the petitioner has not demonstrated that he would have prevailed on the suppression motion. The post-conviction court found that "[t]he facts in the present case establish that [the petitioner], not Officer Widener[,] initiated the discourse and that Widener told [the petitioner] of his right to have his lawyer present." That finding, which is entitled to a presumption of correctness, *see Fields*, 40 S.W.3d at 450, satisfies the legal requirement that once a suspect makes an unequivocal request to deal with the police only through counsel, the subject may not be further interrogated until counsel has been made available, unless the suspect "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 1885 (1981).

The petitioner's assault on counsel's effectiveness in failing to challenge the "especially heinous, atrocious, or cruel" death penalty aggravating factor gains no momentum on appeal. As the post-conviction court noted, eliminating one of the state's noticed aggravating sentencing factors would not have removed the threat that the petitioner could receive the death penalty. Prejudice, therefore, has not been shown. Furthermore, we are not convinced that a constitutional vagueness challenge to Tennessee's current or former version of the "heinous, atrocious, or cruel" aggravating circumstance would necessarily succeed. *See Bell v. Cone*, ___ U.S. ___, ___, 125 S. Ct. 847, 854-55 (2005) (narrowing construction of the aggravator that Tennessee Supreme Court applied in *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981), was not unconstitutionally vague).

The petitioner's argument that his guilty pleas were not knowingly, voluntarily, or intelligently entered, likewise, fails. Certainly, due process demands that a guilty plea be entered voluntarily, knowingly, and understandingly. *See Boykin v. Alabama*, 395 U.S. 238, 242-44, 89 S. Ct. 1709, 1711-13 (1969). A plea is involuntary if the accused is incompetent or "only if it is the product of 'ignorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43, 89 S. Ct. at 1712). A defendant's testimony at a plea hearing that his or her plea is voluntary is a "formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977).

Nothing in the transcript of the petitioner's plea submissions suggests that he was incapable of rationally weighing the advantages of pleading guilty versus proceeding to trial. In addition, other than the petitioner's self-serving testimony regarding his depression, he offered no independent corroboration that he was incapable of making a rational decision.[1] The post-conviction

---

[1]

To the extent that the petitioner is also claiming that trial counsel were ineffective in failing to obtain a psychological evaluation or to recruit expert testimony to negate premeditation, the petitioner has failed to demonstrate what a psychological evaluation or expert testimony would have uncovered, and he has not demonstrated that a reasonable probability exists that, "but for counsel's errors, he would not have pleaded guilty and would have insisted

8

court accepted, as reasonable, the petitioner's claim that he was depressed, but it correctly assessed that claim as inadequate, without more, to prove that his guilty pleas were involuntary. We agree.

The last matter concerns the state's failure to provide to the petitioner the exculpatory evidence that co-defendant McCarter had confessed to killing the victim. The post-conviction court found that the state had withheld exculpatory evidence but that the outcome of the proceeding was not affected.

In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97; *see also Hartman v. State*, 896 S.W.2d 94, 101 (Tenn. 1995). In order to establish a due process violation under *Brady*, four prerequisites must be met: (1) the defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information, whether requested or not); (2) the state must have suppressed the information; (3) the information must have been favorable to the accused; and (4) the information must have been material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).

The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Id.* When determining the materiality of undisclosed information, a reviewing court must assess whether "in [the] absence [of the information, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1556 (1995). In other words, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. *Edgin*, 902 S.W.2d at 390-91.

We agree with the post-conviction court's assessment that the evidence does not satisfy the materiality prong of *Brady*. The petitioner has failed to show how the statement would have led to a reasonable probability that either he would not have pleaded guilty or that he would have obtained a more favorable plea agreement. The state's theory that both the petitioner and McCarter were intimately involved in the homicide was no secret, and both subjects had criminal responsibility for the victim's death. Accordingly, we conclude that the petitioner is entitled to no relief on this ground.

For the foregoing reasons, we conclude that none of the petitioner's claims merits relief. Accordingly, the judgment of the post-conviction court is affirmed.

---

on going to trial." *Hill*, 474 U.S. at 59, 106 S. Ct. at 370; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

_____
JAMES CURWOOD WITT, JR., JUDGE