Filed 1/23/14  P. v. Lobato CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039453 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1242003) |
| v. | |
| JOE NESTOR LOBATO, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

After his motion to suppress evidence (Pen. Code, § 1538.5)[1] was denied, defendant Joe Nestor Lobato pleaded no contest to possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) and being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)).  The trial court suspended imposition of sentence and placed defendant on probation for two years.  The court also ordered defendant to pay a probation supervision fee of up to $110 per month.

On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence.  He argues that he was detained without reasonable suspicion, in violation of the Fourth Amendment of the United States Constitution.  Defendant also contests the probation supervision fee, claiming there was insufficient evidence of his

---

[1] Further unspecified statutory references are to the Penal Code.

ability to pay the fee. He argues that trial counsel rendered ineffective assistance for failing to object to the probation supervision fee. As we will explain, we will reverse and remand the judgment so that the trial court may determine the defendant's ability to pay the probation supervision fee.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

At 11:41 p.m. on August 11, 2012, Santa Clara Police Officers Erickson, Van Diemen, and Henry received a dispatch call reporting an incident at a residence on the 700 block of Asbury in Santa Clara. The caller reported seeing someone with a flashlight in a neighbor's backyard. The caller mentioned that the neighbors were away on vacation. The officers arrived near the reported location approximately 20 minutes after the dispatch call. Officer Erickson was in one patrol vehicle, and Officers Van Diemen and Henry followed in a second vehicle.

The officers traveled eastbound on a two-way residential street, one block from the 700 block of Asbury. As they approached a T-intersection, Officer Erickson saw a light coming towards him. Defendant was riding his bike northbound towards the T-intersection. The light was defendant's bicycle light. Defendant was the only person Officer Erickson saw in the area that evening.

Officers Erickson and Van Diemen shined their vehicles' spotlights on defendant. Defendant slowed down his bicycle and came to a stop 20 to 30 yards from the patrol vehicles. Officer Erickson parked his car in the T-intersection in the middle of street, and Officer Van Diemen parked directly behind him. Officer Erickson did not block defendant's "direction of travel," so defendant could have turned left or right at the T-intersection.

All three officers got out of their cars, and they walked quickly towards defendant. As the officers approached defendant, they observed that he was very nervous and

---

[2] The factual background is based on the transcript from the preliminary hearing/motion to suppress.

2

sweating profusely.  Officer Van Diemen, who was qualified as an expert in identifying persons under the influence of methamphetamine, noticed "almost immediately" that defendant displayed objective symptoms of being under the influence.

Officer Erickson, who stood about 10 feet away, asked defendant if he lived in that area.  Defendant replied that he did not live in that immediate area, but he was heading home.  Defendant indicated that he lived a few blocks away.  Officer Erickson then explained that the officers were investigating a call about a prowler, and he asked defendant for his identification.  Defendant provided his identification, and Officer Erickson checked to see if defendant had any warrants.

Officer Erickson asked defendant if he had anything illegal on him.  Defendant replied " 'no.' "  Officer Erickson then asked if he could search defendant.  Defendant asked " 'why?' "  Officer Erickson explained that he was looking for contraband or weapons.  Defendant asked what would happen if he did not consent to a search.  Officer Erickson responded that he was asking for permission to search, but if defendant did not consent and Officer Erickson was able to determine another lawful reason to search, then the officer would do so.  Defendant replied, " 'Okay, then.  But I have stuff on me.' " Officer Van Diemen asked what defendant meant by " 'stuff,' " and defendant said he had methamphetamine on him.

Officer Van Diemen placed defendant in handcuffs and searched him.  During the search, Officer Van Diemen found a small baggie containing a clear crystal-like substance in defendant's pants pocket.  The substance was later tested and identified as methamphetamine.

On September 28, 2012, the People filed a complaint charging defendant with possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) and being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)).  On December 21, 2012, defendant filed a motion to suppress the evidence relating to the search conducted on August 11, 2012, contending that the search was the result of an

3

unlawful detention and arrest. The People filed opposition, arguing that the search was a result of a consensual encounter, and alternatively, that the officers had reasonable suspicion to detain defendant.

On January 9, 2013, the trial court held a hearing on the motion to suppress and denied the motion. On February 21, 2013, defendant filed a renewed motion to suppress pursuant to section 1538.5, subdivision (i). The court denied the motion on March 5, 2013. After his renewed motion to suppress was denied, defendant pleaded no contest to possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) and being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)). The court found him eligible for Proposition 36 probation and referred him to the Department of Alcohol and Drug Services (DADS) for an assessment.

At the sentencing hearing on March 14, 2013, the trial court suspended imposition of sentence and placed defendant on probation for two years. The court ordered various fines and fees. One of the fees was a probation supervision fee that was not to exceed $110 per month.

### III. DISCUSSION

#### A. *Denial of the Motion to Suppress*

Defendant contends the trial court erred by denying his motion to suppress. He argues that he was detained when the three officers, who were driving two separate cars, shined their spotlights on him, parked their cars in the middle of the street, "briskly" approached him, and then asked for his identification. Defendant contends that the officers did not have reasonable suspicion to detain him because they did not have a " 'particularized and objective basis' for suspecting him of involvement in criminal activity."

The Attorney General replies that the initial encounter between the officers and defendant was consensual. The officers "merely shined their spotlights on [defendant]"; "[t]he officers did not block [defendant]'s direction of travel"; defendant "voluntarily

4

stopped riding his bicycle"; and the officers told defendant they were investigating a call and asked him questions, which defendant voluntarily answered. The Attorney General asserts that "[u]nder the totality of these circumstances, it is evident that until the search began, a reasonable person in [defendant's] shoes would have felt free to decline to answer the officers' questions and to end the encounter. Thus, there was no detention triggering Fourth Amendment scrutiny." In the alternative, the Attorney General argues that the officers had reasonable suspicion to detain defendant. "[Defendant] was riding his bicycle with a light at midnight in an area where there had been a report of a prowler using a flashlight less than 20 minutes before the police spotted him"; Officer Van Diemen knew that bicycle lights are often detachable; defendant was the only person the officers saw in the area; defendant indicated he did not live in the area; and defendant was wearing dark clothing. "Based on the totality of the foregoing circumstances . . . the officers had reasonable suspicion to detain [defendant]."

### 1. Proceedings Below

#### a. *Motion to Suppress*

In defendant's written motion to suppress, he provided a summary of the facts, an allegation that he was searched without a warrant, and an assertion that it was the prosecution's burden to justify the warrantless search. (See *People v. Williams* (1999) 20 Cal.4th 119, 130 ["when the basis of a motion to suppress is a warrantless search or seizure, the requisite specificity is generally satisfied, *in the first instance,* if defendants simply assert the absence of a warrant and make a prima facie showing to support that assertion"].) Defendant argued that the officers' identification of him and any evidence that resulted from the detention and arrest must be suppressed.

In opposition, the prosecutor argued that the officers' initial contact with defendant was consensual. The prosecutor argued that after the officers shined their spotlight, "there was no additional overt action . . . that would transform this encounter into a detention." Additionally, the prosecutor asserted that "[m]erely approaching

5

Defendant and asking to speak with him does not constitute a seizure under the Fourth Amendment." Alternatively, the prosecutor argued that the officers had reasonable suspicion to detain defendant based on the dispatch call they received about a prowler in the area carrying a flashlight, defendant's dark clothing, and defendant's bike light, which could have been detachable.

At the hearing on the motion to suppress, defendant highlighted that Officer Van Diemen used the words " 'stopped' " and " 'detained' " in the police report and in his testimony to describe the initial contact. Defendant asserted that this description of the incident showed that the officer subjectively believed that the initial contact was a detention, and he argued that the officer's belief affected the way the officer interacted with defendant. Defendant also asserted that when the officers parked their cars in the middle of the street, they blocked his path. Additionally, defendant stated that "[s]potlights are indicators of detention. Officers approaching quickly, more than one officer, more than one police car and the physical taking of someone's driver's license or identification during that . . . warrants check are all indications of a detention."

The prosecutor responded that "the fact that Officer Van Diem[e]n characterized it as a detention in his report is not dispositive." The prosecutor also noted, "Officer Erickson specifically stated in his testimony that he was not blocking the defendant and that the defendant could have gone around him if he had kept traveling." In addition, the prosecutor argued that the officers' acts of shining their vehicle spotlights on defendant, walking towards him, and "simply ask[ing] questions of him" did not constitute a detention.

The trial court stated that "when the neighbor calls the police at midnight to report . . . a flashlight in his neighbor's backyard, . . . he knows that flashlights at that hour must be something unusual. Otherwise, why call 9-1-1? . . . [¶] So I am going to deny the motion for this reason, although it's fairly close. The detention or so-called detention, I don't really think was a detention. The officers are investigating and they

6

stop very far away from the defendant and he stops on his own." The court noted the "white spotlights alone are not going to be enough. . . . [¶] On the other hand, even if he wasn't detained, they do -- the only person in the area at midnight that can be used as a flashlight, which is [defendant]." [*Sic.*] "So I think they have an obligation to stop him, at least, and question him as to why he is in the area." The court noted, "if [the officers] didn't investigate, they would be derelict in their duties."

### b. Renewed Motion to Suppress

In defendant's renewed motion to suppress, he argued, as he did in the original motion, that the initial contact was a detention and that the officers did not have reasonable suspicion. Defendant argued that the report of a prowler with a flashlight, alone, was "insufficient to establish that criminal activity was afoot." Furthermore, defendant argued that even if the dispatch call was sufficient to establish reasonable suspicion of criminal activity, the detention was not justified because (1) there was no description about the possible suspect, (2) the initial contact occurred 20 minutes after the dispatch call was received, (3) the caller never mentioned a bike, and (4) defendant did not have a flashlight.

In opposition, the prosecutor first argued that the initial contact was consensual. Alternatively, the prosecutor argued that the officers had reasonable suspicion based on the totality of circumstances. The prosecutor asserted that even if there was an innocent explanation for the person with a flashlight, "the possibility of innocent explanations does not remove reasonable suspicion." The prosecutor also noted that when the officers saw the light on defendant's bicycle moving towards them, they could not tell whether it was a flashlight. Furthermore, defendant was the only person the officers saw near the area.

At the hearing on the renewed motion to suppress, the prosecutor called Officer Van Diemen to provide additional testimony about his experience with bicycle lights, his observations of defendant's dark clothing, and his conversation with defendant in which defendant admitted using drugs earlier that day. Officer Van Diemen testified that

7

bicycle lights are easily detachable and can be used as a flashlight. The officer also testified that defendant was wearing dark clothing that evening. Officer Van Diemen commented that dark clothing makes it easier for a criminal to remain undetected at night.

After hearing argument, the trial court denied the renewed motion to suppress. The court stated that it was "more than satisfied that the officers' contact was consonant with the Fourth Amendment."

### 2. Standard of Review

"In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] . . . We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. [Citation.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

### 3. Analysis

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.] Our present inquiry concerns the distinction between consensual encounters and detentions. Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.]

". . . The United States Supreme Court has made it clear that a detention does not occur when a police officer merely approaches an individual on the street and asks a few questions. [Citation.] As long as a reasonable person would feel free to disregard the

8

police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur. [Citations.] '[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred. [Citation.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)

Mere police questioning does not amount to an involuntary detention. (*United States v. Drayton* (2002) 536 U.S. 194, 200-201 (*Drayton*).) "Where a consensual encounter has been found, police may inquire into the contents of pockets [citation]; ask for identification [citation]; or request the citizen to submit to a search [citation]. It is not the nature of the question or request made by the authorities, but rather the manner or mode in which it is put to the citizen that guides us in deciding whether compliance was voluntary or not." (*People v. Franklin* (1987) 192 Cal.App.3d 935, 941 (*Franklin*).)

Defendant contends his case is analogous to *People v. Garry* (2007) 156 Cal.App.4th 1100 (*Garry*). In *Garry,* the police officer was in his patrol car in a "high-crime, high-drug area." (*Id.* at p. 1103.) For a few seconds, the officer watched the defendant standing next to a parked car. (*Id.* at pp. 1103-1104.) After illuminating

the defendant with the spotlight on the patrol car, the officer exited his vehicle and walked so " 'briskly' " that he traveled 35 feet in " 'two and a half, three seconds.' " (*Id.* at p. 1111.) The officer disregarded the defendant's statement that he was standing outside his own home, and the officer immediately asked the defendant whether he was on probation or parole. (*Id.* at pp. 1111-1112.) The Court of Appeal determined that the police officer's conduct "taken as a whole, would be very intimidating to any reasonable person." (*Id.* at p. 1111.) "[The officer's] actions set an unmistakable 'tone,' albeit largely through nonverbal means, 'indicating that compliance with the officer's request might be compelled.' [Citation.]" (*Id.* at p. 1112.)

The record here reflects that the tone set by the officers during the encounter with defendant was much different than that set by the "aggressive" and "intimidating" actions of the officer, as described by the court in *Garry.* (*Garry, supra,* 156 Cal.App.4th at p. 1112.) In this case, Officers Erickson, Van Diemen, and Henry were at an intersection when they saw defendant riding his bicycle towards the intersection. The officers, who were in two patrol vehicles, shined their vehicles' spotlights on him and parked their cars one behind the other. Defendant voluntarily slowed down and stopped his bicycle 20 to 30 yards away from the officers. All three officers then got out of their cars and walked quickly towards defendant. During this initial contact, the officers did not use their emergency lights or give any commands. Furthermore, though the officers parked their cars in a traffic lane, they did not obstruct defendant's path. The officers also did not have their weapons drawn, and they stood about 10 feet away from defendant to talk to him.

Officer Erickson engaged in conversation with defendant, asking defendant whether he lived in the area and explaining that the officers were investigating a call about a prowler in the neighborhood. Officer Erickson then asked to see identification and ran a warrant check. Unlike *Garry,* Officer Erickson did not immediately ask whether defendant was on probation or parole. Nor did he immediately ask to run a

10

warrant check. Additionally, nothing in the record indicates that Officer Erickson used an authoritative tone or engaged in any nonverbal, coercive conduct in questioning defendant. Where cooperation was not induced by coercive means, merely approaching a person and asking questions does not amount to an involuntary detention. (*Drayton, supra,* 536 U.S. at pp. 200-201; *Manuel G., supra,* 16 Cal.4th at p. 821.) Further, asking defendant for identification and running a warrant check did not turn the encounter into a detention. (*Drayton, supra,* 536 U.S. at p. 201; *Franklin, supra,* 192 Cal.App.3d at p. 941.)

Although three officers approached defendant, the presence of several officers does not, by itself, transform an encounter into a detention. (See *Drayton*, *supra*, 536 U.S. at p. 205 [a second officer's presence during an encounter on a bus did not turn an encounter into a seizure]; *INS v. Delgado* (1984) 466 U.S. 210, 219 [presence of several agents by exits posed "no reasonable threat of detention"].) In this case, the officers did not have their weapons drawn, nor did they engage in any coercive conduct that would make a reasonable person feel that he or she was not free to leave. (*Manuel G., supra,* 16 Cal.4th at p. 821.) Rather, the record reflects that Officer Erickson asked defendant most of the questions while the other two officers stood next to Officer Erickson.

In short, the circumstances here do not show that the officers demonstrated a show of authority such that a reasonable person in defendant's situation would not have felt free to leave. Thus, the initial encounter was not a detention.

Even assuming that the initial contact was a detention, the officers had reasonable suspicion to detain defendant. A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts which, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity. (*People v. Souza* (1994) 9 Cal.4th 224, 231; see also *In re Tony C.* (1978) 21 Cal.3d 888, 893.) The reasonable suspicion

11

that justifies a detention is simply a particularized and objective basis for suspecting the person stopped of criminal activity. (*Ornelas v. United States* (1996) 517 U.S. 690, 696.)

"Reasonable suspicion is a lesser standard than probable cause . . . . But to be reasonable, the officer's suspicion must be supported by some specific, articulable facts that are 'reasonably "consistent with criminal activity." ' [Citation.] The officer's subjective suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." [Citation.]' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083 (*Wells*); see also *People v. Glaser* (1995) 11 Cal.4th 354, 363.)

In this case, the officers, who were one block from the location where someone had seen a prowler with a flashlight, saw defendant riding a bicycle with a bicycle light. Officer Van Diemen knew from experience that bicycle lights are often detachable and can be used as flashlights. Defendant was also the only person that the officers saw in the area, and the encounter occurred at midnight, which was only 20 minutes after the dispatch call. (Cf. *People v. Conway* (1994) 25 Cal.App.4th 385, 390 [officer had reasonable suspicion to detain a car's occupants where, shortly after receiving a report of a burglary, the officer saw the car leaving the area of the reported burglary].) Defendant was also wearing dark clothing, which Officer Van Diemen knew to be something a criminal would wear to escape detection. Under the totality of the circumstances, we find that the officers' decision to walk up to defendant was based on "articulable facts that are 'reasonably "consistent with criminal activity," ' " and was not "predicated on mere curiosity, rumor, or hunch." (*Wells, supra,* 38 Cal.4th at p. 1083). Once the officers walked up to defendant, they noticed "almost immediately" that he was nervous and sweating profusely, which were objective symptoms of being under the influence of

methamphetamine. The officers were thus justified in questioning defendant and requesting identification.

Because the officers acted in an objectively reasonable manner in contacting defendant, we conclude that the trial court did not err in denying the motion to suppress. (*Wells*, *supra*, 38 Cal.4th at p. 1083.)

### B. The Probation Supervision Fee

When defendant pleaded guilty, he signed a written plea form, which stated that he could be ordered to pay various fines and fees. One provision of the plea form stated, "Depending upon my ability to pay, I will also be required to pay for the costs of probation supervision ($110 a month) . . . ." During the change of plea hearing, defendant expressed concern about a possible $10 drug testing fee. He stated that he "might have trouble with the global fee for testing." Thereafter, the trial court released defendant on his own recognizance and referred him to DADS for a Proposition 36 assessment.

Nothing in the record indicates that a probation report was filed prior to the sentencing hearing. At sentencing, the trial court suspended imposition of sentence and placed defendant on formal probation for two years. The court ordered him to pay various fines and fees, including a probation supervision fee "not to exceed 110 per month." Defendant agreed to all the terms and conditions of probation without objection.

Defendant contends that the probation supervision fee should be stricken because there was insufficient evidence of his ability to pay the fee. Although defendant acknowledges that he did not object in the trial court, he relies on *People v. Pacheco* (2010) 187 Cal.App.4th 1392, disapproved by *People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*), to argue that his claim has not been forfeited. Defendant alternatively argues that trial counsel was ineffective for failing to object to the fee.

Relying on *McCullough*, *supra*, 56 Cal.4th 589, the Attorney General contends that defendant has forfeited his claim of insufficiency of the evidence of his ability to pay

13

the probation supervision fee[3].  (See also *People v. Snow* (2013) 219 Cal.App.4th 1148, 1151; *People v. Valtakis* (2003) 105 Cal.App.4th 1066 (*Valtakis*).)  The Attorney General further argues that the trial court made an implied finding that defendant had the ability to pay.  Additionally, the Attorney General contends that trial counsel was not ineffective for failing to object to the fee.

We observe that this case presents a unique circumstance as nothing in the record indicates a probation report was filed, and the record contains no information about defendant's financial circumstances other than defendant's concern about a $10 drug testing fee.  (Cf. *Valtakis*, *supra*, 105 Cal.App.4th at p. 1069.)

Section 1203.1b sets forth a process that must be followed before the trial court may impose a probation supervision fee.  First, the court must order the defendant to report to the probation officer, who will then make a determination of the defendant's ability to pay.  (§ 1203.1b, subd. (a).)  After the probation officer determines the amount the defendant may be able to pay, the probation officer must inform the defendant that he or she is entitled to a hearing, during which the court will make a determination of the defendant's ability to pay and the payment amount.  (§ 1203.1b, subd. (a).)  A defendant may waive his or her right to a hearing, but this waiver must be made knowingly and intelligently.  (§ 1203.1b, subd. (a).)  If no waiver is given, the probation officer must refer the matter back to the trial court, and the trial court will make a determination of defendant's ability to pay.  (§ 1203.1b, subd. (b).)

Since the record on appeal does not include a probation report or any information about defendant's financial circumstances, we conclude that this matter must be

---

[3] The California Supreme Court is currently considering the issue of whether a defendant who fails to object to an order for payment of probation supervision fees forfeits a claim that the trial court erred in failing to make a finding of an ability to pay. (*People v. Aguilar* (2013) 219 Cal.App.4th 1094, review granted Nov. 26, 2013, S213571 and *People v. Trujillo,* review granted Nov. 26, 2013, S213687 [nonpub. opn.].)

14

remanded to the trial court for compliance with the statute.  Thus, we need not reach the issues of waiver, ineffective assistance of counsel, and defendant's ability to pay.

## IV.DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for the limited purpose of allowing the trial court to follow the statutory procedure in section 1203.1b before imposing a probation supervision fee.


_____
BAMATTRE-MANOUKIAN, ACTING P.J.




WE CONCUR:




_____
MÁRQUEZ, J.




_____
GROVER, J.

15