# IN THE COURT OF APPEALS OF IOWA

No. 19-0750
Filed February 5, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATTHEW JOSEPH POOCK,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Bremer County, Chris Foy, Judge.


        A defendant appeals his conviction for operating while intoxicated, third offense.   **AFFIRMED.**


        Kevin D. Engels of Correll, Sheerer, Benson, Engels, Galles & Demro, PLC, Cedar Falls, for appellant.

        Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.


        Considered by Doyle, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

Matthew Poock appeals his conviction for operating while intoxicated, third offense. He challenges the district court's denial of his motion to suppress evidence obtained after he was stopped by a police officer. Because the record shows the officer had reasonable suspicion to seize Poock to investigate a citizen's report of erratic driving, we affirm.

## I.      Facts and Prior Proceedings

On a May evening in 2018, Bremer County dispatch received a 911 call from Michela Siems-Dighton, an employee of the Cedar Falls school district. She was playing on her recreational softball team at the Waverly ballfields when she witnessed two men in a nearby car blasting music and "making idiots of themselves." They drove a white Chevrolet Traverse with personalized Hawkeye license plates. She watched them drive by from the west, stop, and park near the diamond. The two men left the car doors open and were "hooting and hollering" while they went into a building with restrooms.[1] They returned to the Traverse and "sped away," kicking up gravel on the drive. When they reached the paved road, she heard their engine revving and their tires squealing. Siems-Dighton watched the Traverse "swerving" back and forth across the road until it was out of sight.

She then heard "a crash and a horn blaring, like laying on the horn." She called 911 after two people who saw the crash told her the Traverse had hit "what they thought was a tree." The occupants left the car and looked like they planned

---

[1] Siems-Dighton also testified she saw beer cans in the men's hands when they came out of the restrooms but she admitted she could not tell for sure what kind of beverages they held.

to run away but instead returned to the car and took off down an alley on the north side of the adjacent swimming pool.

After dispatch called Siems-Dighton back for more information, she described the car's occupants as two white men in their late twenties or thirties wearing golfing attire—one dressed in a white polo shirt and black hat and the other with a blue polo shirt and nice pants or shorts. They both wore golf shoes. So she guessed they had come from a nearby golf course. Siems-Dighton said she thought the plate number started with the letter "I." Siems-Dighton estimated the Traverse drove away about five minutes before the call to dispatch ended.

Waverly police officer Holly Jacobsen responded to the call, estimating seven to ten minutes elapsed from the time the Traverse left the ballfields until she saw a vehicle matching the caller's description. The officer was turning onto the Bremer Bridge, about four blocks from the law center, when she spotted a white Chevy Traverse with Hawkeye plates. But the license plate number did not start with an "I". The officer "made a U-turn to get behind the vehicle and look closer." As she followed the vehicle, she saw two white men inside, one wearing a white shirt and one wearing a blue shirt. She did not notice any visible damage to the vehicle. Not long after the officer started following it, the Traverse pulled into the parking lot near State Bank and the Wooden Foot, a local bar. She continued past the entrance but then made a U-turn back to the lot.

By the time the officer entered the lot, the Traverse had parked and the occupants were walking toward the bar. Officer Jacobsen did not turn on her flashing lights or siren. As she pulled in, she "waved to the male in the white shirt" and said either "hold up" or "hang on"—she couldn't remember which phrase.

Then, as she exited her patrol car, the man in the white shirt—later identified as Poock—said, "How are you doing?" By the time the officer called to him, Poock was about three parking spots away from the Traverse and headed toward the bar but returned and met her "in the middle." The officer asked "Hey, are you the white Chevy—are you the white Traverse?"[2] He responded, "Yes," and Jacobsen said, "Can I talk to you for a second?" She asked where he had come from; he said he had just picked up "Spencer," pointing to his companion in the blue shirt.

According to the minutes of evidence, the officer asked Poock for his identification. He then told her they were heading to "the Foot for nachos after golfing." The officer recalled smelling "a strong odor of alcohol coming from him." When he removed his sunglasses, the officer saw his eyes were "very glassy, red and bloodshot." After conducting field sobriety tests, the officer arrested Poock.

The State charged Poock with operating while intoxicated as a third offense. *See* Iowa Code § 321J.2(2)(c) (2018). Poock moved to suppress evidence gathered during his exchange with the officer, alleging he was unlawfully seized. The district court denied the motion, holding "the initial interaction between Officer Jacobsen and Defendant did not amount to a seizure for Fourth Amendment purposes." Following a trial on the minutes, the court found Poock guilty as charged. Poock appeals, challenging the suppression decision.

## II. Scope and Standard of Review

We review the suppression record and ruling de novo. *State v. White*, 887 N.W.2d 172, 176 (Iowa 2016). The Fourth Amendment to the United States

---

[2] During her investigation, the officer noticed minor damage on Traverse.

Constitution and article 1, section 8 of the Iowa Constitution protect a person against unreasonable searches and seizures. U.S. Const. amend. IV; Iowa Const. art. I, § 8; *State v. Brown*, 930 N.W.2d 840, 845, 846 (Iowa 2019). Poock does not argue for a reading of the Iowa Constitution divergent from interpretations of the United States Constitution. So we will use the same analysis for both. *See State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008).

### III. Analysis

Poock contests the district court's finding that his encounter with Officer Jacobsen was not a seizure under the Fourth Amendment. He also argues the officer lacked reasonable suspicion or probable cause to stop him.

An officer "seizes" a person when the officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *State v. Harlan*, 301 N.W.2d 717, 719 (Iowa 1981) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). We assess whether a seizure occurred by examining the totality of the circumstances. *Wilkes*, 756 N.W.2d at 842. Relevant factors may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 842–43 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Police officers do not commit unreasonable seizures "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004) (quoting *United States v. Drayton*, 536 U.S. 194, 200–01 (2002)). "Even when law enforcement officers have no basis for suspecting a particular individual, they may

pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Id.*

The district court found Officer Jacobsen's initial encounter with Poock was voluntary because Poock had parked his car and Jacobsen did not execute a traffic stop. Rather, according to the suppression ruling, Poock "initiated a conversation with her" and admitted he was the owner of the Traverse before she asked him to "hold up."

In our de novo review, we read the suppression transcript differently. Officer Jacobsen testified that as she pulled into the parking lot she waved to the man in the white shirt and asked him to "hold up" or "hang on." It was not until after that command that the man, later identified as Poock, engaged her in conversation. At the suppression hearing, Officer Jacobsen agreed the "clear import" of her directive was for Poock to stop so she could talk to him. She acknowledged if Poock had kept walking rather than respond, she would have pursued him.

Seizure is a close one here. On the one hand, Jacobsen had been following Poock in a marked patrol vehicle and was wearing her uniform during their encounter. On the other hand, she was alone and did not activate her lights or siren. *See generally White*, 887 N.W.2d at 177 (finding officer's directive to suspect to step off his porch onto the driveway was "mandatory" especially "in conjunction with the flashing emergency lights and nearby patrol car").

Also in the balance, Officer Jacobsen did not make physical contact with Poock, but she did use language that a reasonable person in his position would have believed compelled compliance. *See Brendlin v. California*, 551 U.S. 249, 255 (2007) (measuring "coercive effect of the encounter" by asking whether "a

reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" (citation omitted)).  A uniformed officer's command that someone walking away "hold up" or "hang on" would likely constrain a reasonable person to stop.  Other courts have reached that conclusion.  *See, e.g.*, *United States v. Hood*, No. 19-cr-315, 2020 WL 353859, at *4 (D.D.C. Jan. 21, 2020) (finding "little discernable difference between the phrase 'hold on a sec' and 'stop'—both command that the target stop moving"); *State v. Bravo-Zamora*, No. 109,998, 2015 WL 249838, at *8 (Kan. App. Jan. 9, 2015) (finding reasonable person would not feel free to terminate encounter with officer by ignoring command to "[h]ang on one second."); *People v. Verin*, 269 Cal. Rptr. 573, 576 (Cal. App. 1st Dist. 1990) (finding seizure when officer demanded, "Hold on, Police"); *Jones v. State*, 572 A.2d 169, 172 (Md. 1990) (holding street encounter was non-consensual when single officer pulled up in marked car and called to bicyclist "[h]old on a minute" or "[h]ey, wait a minute").  But we need not resolve the seizure question.  We may affirm on an alternative ground advanced by the State.  *See State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012).

Assuming without deciding Officer Jacobsen seized Poock, we find no illegality because Jacobsen had reasonable suspicion to conduct a *Terry* stop. *See Terry*, 392 U.S. at 21–22.  To justify an investigatory stop, the State must prove by a preponderance of the evidence that the stopping officer had "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion."  *See State v. Baker*, 925 N.W.2d 602, 611 (Iowa 2019) (alternation in original) (quoting *Terry*, 392 U.S. at 21).

Here, police received a citizen's tip that the driver of a white Chevy Traverse with Hawkeye license plates was acting like an "idiot" and driving erratically; the named caller reported that the Traverse hit a tree and its two occupants contemplated running from that crash scene. She expressed concern the pair had been consuming alcohol. The caller gave a detailed description of the two men and what they were wearing. The caller accurately described the vehicle, except for the initial letter of the license plate. The caller also told dispatch the direction of the Traverse's travel.

Acting on that tip, Officer Jacobsen located Poock's white Traverse with Hawkeye plates in less than ten minutes. She followed him briefly but observed no dangerous driving. When he pulled into a parking lot and started walking toward a bar, the officer decided to question Poock about the citizen's report. As the State argues, the officer had reasonable suspicion to do so. *See State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013) (explaining reasonable suspicion can arise from information less reliable than required to show probable cause).

Importantly, the stopping officer aimed to investigate information provided by an identified, citizen caller. *Compare State v. Campbell*, No. 13-0558, 2014 WL 1494906, at *2 (Iowa Ct. App. Apr. 16, 2014) (noting tipster was not anonymous, but known and remained available so she could be held accountable for the information provided), *with Kooima*, 833 N.W.2d at 211 (reversing conviction where anonymous tipster did not relay contemporaneous observation of erratic driving or any facts revealing driver exhibited any signs of intoxication). Courts generally consider information imparted by a citizen informant to be reliable. *See State v. Ruhs*, 885 N.W.2d 822, 827 (Iowa Ct. App. 2016).

That caller passed on personal observations of the driver's erratic conduct. And the caller shared enough details with dispatch to enable Officer Jacobsen to track down the described vehicle in short order. A minor discrepancy involving the license plate number did not defeat the officer's reasonable suspicion. *See State v. Waters*, 538 N.W.2d 862, 863 (Iowa Ct. App. 1995). As reported by Siems-Dighton, the officer could see the driver of the Traverse was wearing a white shirt. As that driver walked toward a bar, the officer had reasonable suspicion to stop him to investigate the citizen report that impaired driving might have occurred.

Because the officer did not violate the prohibition against unlawful search and seizure, we affirm the district court's ruling on the motion to suppress and affirm the conviction.

**AFFIRMED.**